# BROWN ET AL. *v.* LEGAL FOUNDATION OF WASHINGTON ET AL.

No. 01–1325.   Argued December 9, 2002—Decided March 26, 2003

218

STEVENS, J., delivered the opinion of the Court, in which O'CONNOR, SOUTER, GINSBURG, and BREYER, JJ., joined. SCALIA, J., filed a dissent-

ing opinion, in which REHNQUIST, C. J., and KENNEDY and THOMAS, JJ., joined, *post*, p. 241. KENNEDY, J., filed a dissenting opinion, *post*, p. 253.

*Charles Fried* argued the cause for petitioners. With him on the briefs were *Daniel J. Popeo, Richard A. Samp, James J. Purcell,* and *Donald B. Ayer.*

*David J. Burman* argued the cause for respondents Legal Foundation of Washington et al. With him on the brief were *Nicholas P. Gellert, Kathleen M. O'Sullivan, Carter G. Phillips,* and *Stephen B. Kinnaird.*

*Walter Dellinger* argued the cause for respondent Justices of the Washington Supreme Court. With him on the brief were *Christine O. Gregoire,* Attorney General of Washington, and *Maureen Hart,* Senior Assistant Attorney General.*

---

*James S. Burling* filed a brief for the Pacific Legal Foundation as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the State of California et al. by *Bill Lockyer,* Attorney General of California, *Richard M. Frank,* Chief Assistant Attorney General, *J. Matthew Rodriquez,* Senior Assistant Attorney General, *Daniel L. Siegel,* Supervising Deputy Attorney General, *Christiana Tiedemann,* Deputy Attorney General, *Thomas F. Reilly,* Attorney General of Massachusetts, and *William W. Porter* and *Amy Spector,* Assistant Attorneys General, and by the Attorneys General for their respective jurisdictions as follows: *Janet Napolitano* of Arizona, *Ken Salazar* of Colorado, *Richard Blumenthal* of Connecticut, *Robert A. Butterworth* of Florida, *Earl I. Anzai* of Hawaii, *James E. Ryan* of Illinois, *Steve Carter* of Indiana, *Thomas J. Miller* of Iowa, *Carla J. Stovall* of Kansas, *Richard P. Ieyoub* of Louisiana, *G. Steven Rowe* of Maine, *J. Joseph Curran, Jr.,* of Maryland, *Jennifer M. Granholm* of Michigan, *Mike Hatch* of Minnesota, *Mike Moore* of Mississippi, *Mike McGrath* of Montana, *Frankie Sue Del Papa* of Nevada, *Philip T. McLaughlin* of New Hampshire, *David Samson* of New Jersey, *Patricia A. Madrid* of New Mexico, *Eliot Spitzer* of New York, *Roy Cooper* of North Carolina, *Wayne Stenehjem* of North Dakota, *Betty D. Montgomery* of Ohio, *W. A. Drew Edmondson* of Oklahoma, *Hardy Myers* of Oregon, *D. Michael Fisher* of Pennsylvania, *Sheldon Whitehouse* of Rhode Island, *Charlie Condon* of South Carolina, *Mark Barnett* of South Dakota, *Paul G. Summers* of Tennessee, *Mark L. Shurtleff* of Utah, *William H. Sorrell* of Vermont, *Darrell V. McGraw, Jr.,* of West Virginia, and *Anabelle Rodríguez* of Puerto Rico; for the City and County of San Francisco by *Andrew W.*

JUSTICE STEVENS delivered the opinion of the Court.

The State of Washington, like every other State in the Union, uses interest on lawyers' trust accounts (IOLTA) to pay for legal services provided to the needy. Some IOLTA programs were created by statute, but in Washington, as in most other States, the IOLTA program was established by the State Supreme Court pursuant to its authority to regulate the practice of law. In *Phillips* v. *Washington Legal Foundation*, 524 U. S. 156 (1998), a case involving the Texas IOLTA program, we held "that the interest income generated by funds held in IOLTA accounts is the 'private property' of the owner of the principal." *Id.*, at 172. We did not, however, express any opinion on the question whether the income had been "taken" by the State or "as to the amount of 'just compensation,' if any, due respondents." *Ibid.* We now confront those questions.

I

As we explained in *Phillips, id.*, at 160–161, in the course of their legal practice, attorneys are frequently required to hold clients' funds for various lengths of time. It has long been recognized that they have a professional and fiduciary obligation to avoid commingling their clients' money with

*Schwartz* and *John D. Echeverria;* for AARP et al. by *John H. Pickering, Seth P. Waxman, Stephen W. Preston, Jody Manier Kris, Stuart R. Cohen, Rochelle Bobroff, Michael Schuster, Donald M. Saunders, Burt Neuborne, David S. Udell,* and *Laura K. Abel;* for the American Bar Association by *Alfred P. Carlton, Jr., Paul M. Smith,* and *Stephen M. Rummage;* for the Conference of Chief Justices by *Brian J. Serr, Drew S. Days III, Beth S. Brinkmann,* and *Seth M. Galanter;* for the National League of Cities et al. by *Timothy J. Dowling;* for 49 State Bar Associations et al. by *Richard A. Cordray, Joanne M. Garvey, Charles N. Freiberg,* and *Thomas P. Brown;* and for the Chief Justice and Justices of the Supreme Court of Texas et al. by *John Cornyn,* Attorney General of Texas, *Robert A. Long, Jr., Caroline M. Brown, Julie Caruthers Parsley, John M. Hohengarten, Darrell E. Jordan,* and *David J. Schenck.*

*Christopher G. Senior* filed a brief for the National Association of Home Builders as *amicus curiae.*

their own, but it is not unethical to pool several clients' funds in a single trust account. Before 1980 client funds were typically held in non-interest-bearing federally insured checking accounts. Because federal banking regulations in effect since the Great Depression prohibited banks from paying interest on checking accounts, the value of the use of the clients' money in such accounts inured to the banking institutions.

In 1980, Congress authorized federally insured banks to pay interest on a limited category of demand deposits referred to as "NOW accounts." See 87 Stat. 342, 12 U. S. C. § 1832. This category includes deposits made by individuals and charitable organizations, but does not include those made by for-profit corporations or partnerships unless the deposits are made pursuant to a program under which charitable organizations have "the exclusive right to the interest."[1]

In response to the change in federal law, Florida adopted the first IOLTA program in 1981 authorizing the use of NOW accounts for the deposit of client funds, and providing that all of the interest on such accounts be used for charitable purposes. Every State in the Nation and the District of Columbia have followed Florida's lead and adopted an IOLTA program, either through their legislatures or their highest courts.[2] The result is that, whereas before 1980 the banks

---

[1] Letter from Federal Reserve Board General Counsel Michael Bradfield to Donald Middlebrooks (Oct. 15, 1981), reprinted in Middlebrooks, The Interest on Trust Accounts Program: Mechanics of Its Operation, 56 Fla. B. J. 115, 117 (1982).

[2] Five IOLTA programs were adopted by state legislatures. See Cal. Bus. & Prof. Code Ann. § 6211(a) (West 1990); Conn. Gen. Stat. § 51–81c (Supp. 2002); Md. Bus. Occ. & Prof. Code Ann. § 10–303 (2000); N. Y. Jud. Law § 497 (West Supp. 2003); Ohio Rev. Code Ann. § 4705.09(A)(1) (Anderson 2000). The remaining programs are governed by rules adopted by the highest court in the State. See Ala. Rule Prof. Conduct 1.15(g) (1996); Alaska Rule Prof. Conduct 1.15(d) (2001); Ariz. Sup. Ct. Rule 44(c)(2) (2002); Ark. Rule Prof. Conduct 1.15(d)(2) (1987–2002); Colo. Rule

retained the value of the use of the money deposited in non-interest-bearing client trust accounts, today, because of the adoption of IOLTA programs, that value is transferred to

Prof. Conduct 1.15(e) (2002); Del. Rule Prof. Conduct 1.15(h) (2002); D. C. Rules of Court, App. B(a) (2002); Fla. Bar Rule 5-1.1 (2002 Supp.); Ga. Bar Rule 1.15(II) (2002); Haw. Sup. Ct. Rule 11 (2002); Idaho Rule Prof. Conduct 1.15(d) (2003); Ill. Rule Prof. Conduct 1.15(d) (2002); Ind. Rule Prof. Conduct 1.15(d) (2000); Iowa Code Prof. Responsibility DR 9-102 (rev. ed. 2002); Kan. Rule Prof. Conduct 1.15(d)(3) (2002); Ky. Sup. Ct. Rule 3.130, Rule Prof. Conduct 1.15 (2002); La. Stat. Ann., Tit. 37, ch. 4, App., Art. 16, Rule Prof. Conduct 1.15(d) (West Supp. 2003); Me. Code Prof. Responsibility 3.6(e)(4) (2002); Mass. Rule Prof. Conduct 1.15 (2002); Mich. Rule Prof. Conduct 1.15(d) (2002); Minn. Rule Prof. Conduct 1.15(d) (2002); Miss. Rule Prof. Conduct 1.15(d) (2002); Mo. Sup. Ct. Rule Prof. Conduct 4-1.15 (2002); Mont. Rule Prof. Conduct 1.18(b) (2002); Neb. Code Prof. Responsibility DR 9-102 (2000); Nev. Sup. Ct. Rule 217 (2000); N. H. Sup. Ct. Rule 50 (2002); N. J. Rules Gen. Application 1:28A-2 (2003); N. M. Rule Prof. Conduct 16-115(D) (June 2002 Supp.); N. C. Rule Prof. Conduct 1.15-4 (2001); N. D. Rule Prof. Conduct.1.15(d)(1) (2002); Okla. Rule Prof. Conduct 1.15(d) (2002); Ore. Code Prof. Responsibility DR9-101(D)(2) (2002); Pa. Rule Prof. Conduct 1.15(d) (2002); R. I. Rule Prof. Conduct, Art. V, 1.15(d) (2001); S. C. App. Ct. Rule 412 (1990); S. D. Tit. 16, ch. 16-18, App., Rule Prof. Conduct 1.15(e) (1995); Tenn. Sup. Ct. Rule 8, Code Prof. Responsibility DR 9-102(C)(2) (2002); Tex. Rule Prof. Conduct 1.14 (2002); Utah Sup. Ct. Rule, Rule Prof. Conduct 1.15 (2002); Vt. Rule, Code Prof. Responsibility DR 9-103 (2002); Va. Sup. Ct. Rules, pt. 6, §II, Rule Prof. Conduct 1.15 (2002); Wash. Rule Prof. Conduct 1.14 (2002); W. Va. Rule Prof. Conduct 1.15(d) (2002); Wis. Sup. Ct. Rule 20:1.15 (2002); Wyo. Rule Prof. Conduct 1.15(d) (2002).

In Virginia, the legislature has overridden the State Supreme Court's IOLTA Rules. See 1995 Va. Acts ch. 93 (making lawyer participation in the IOLTA program optional rather than mandatory by adding Va. Code Ann. §54.1-3915.1 (2002)). In Indiana, the program was created by legislation but was struck down by the Indiana Supreme Court as an impermissible encroachment on the court's power to regulate the practice of law. See In re Public Law No. 154-1990, 561 N. E. 2d 791 (1990). Later, the Indiana Supreme Court adopted an IOLTA program. See Ind. Rule Prof. Conduct 1.15(d) (2000); Remondini, IOLTA Arrives in Indiana: Trial Judges to Play Key Role in Pro Bono Plan, 41 Res Gestae 9 (1998). Likewise, in Pennsylvania, the state legislature passed the original program but the Pennsylvania Supreme Court took over the program in 1996, suspending the state statute and amending the Rules of Professional Con-

charitable entities providing legal services for the poor. The aggregate value of those contributions in 2001 apparently exceeded $200 million.[3]

In 1984, the Washington Supreme Court established its IOLTA program by amending its Rules of Professional Conduct. *IOLTA Adoption Order*, 102 Wash. 2d 1101. The amendments were adopted after over two years of deliberation, during which the court received hundreds of public comments and heard oral argument from the Seattle-King County Bar Association, designated to represent the proponents of the Rule, and the Walla Walla County Bar Association, designated to represent the opponents of the Rule.

In its opinion explaining the order, the court noted that earlier Rules had required attorneys to hold client trust funds "in accounts separate from their own funds," *id.*, at 1102, and had prohibited the use of such funds for the lawyer's own pecuniary advantage, but did not address the question whether or how such funds should be invested. Commenting on then-prevalent practice the court observed:

> "In conformity with trust law, however, lawyers usually invest client trust funds in separate interest-bearing accounts and pay the interest to the clients whenever the trust funds are large enough in amount or to be held for a long enough period of time to make such investments economically feasible, that is, when the amount of interest earned exceeds the bank charges and costs of setting up the account. However, when trust funds are so nom-

---

duct to require attorney participation in IOLTA. See Azen, Building a Base for Pro Bono in Pennsylvania, 24 Pa. Law. 28 (Mar.–Apr. 2002).

Petitioners appear to suggest that a different constitutional analysis might apply to a legislative program than to one adopted by the State's judiciary. See Brief for Petitioners 23, n. 7; Tr. of Oral Arg. 50–51. We assume, however, that the procedure followed by the State when promulgating its IOLTA Rules is irrelevant to the takings issue.

[3] See Brief for AARP et al. as *Amici Curiae* 11 (citing ABA Commission on Interest on Lawyers' Trust Accounts, IOLTA Handbook 98, 208 (Jan. 1995, updated July 2002)).

inal in amount or to be held for so short a period that the amount of interest that could be earned would not justify the cost of creating separate accounts, most attorneys simply deposit the funds in a single noninterest-bearing trust checking account containing all such trust funds from all their clients. The funds in such accounts earn no interest for either the client or the attorney. The banks, in contrast, have received the interest-free use of client money." *Ibid.*

The court then described the four essential features of its IOLTA program: (a) the requirement that *all* client funds be deposited in interest-bearing trust accounts, (b) the requirement that funds that cannot earn net interest for the client be deposited in an IOLTA account, (c) the requirement that the lawyers direct the banks to pay the net interest on the IOLTA accounts to the Legal Foundation of Washington (Foundation), and (d) the requirement that the Foundation must use all funds received from IOLTA accounts for tax-exempt law-related charitable and educational purposes. It explained:

"1. *All* client funds paid to any Washington lawyer or law firm must be deposited in identifiable interest-bearing trust accounts separate from any accounts containing non-trust money of the lawyer or law firm. The program is mandatory for all Washington lawyers. New CPR DR 9–102(A).

"2. The new rule provides for two kinds of interest-bearing trust accounts. The first type of account bears interest to be paid, net of any transaction costs, to the client. This type of account may be in the form of either separate accounts for each client or a single pooled account with subaccounting to determine how much interest is earned for each client. The second type of account is a pooled interest-bearing account with the interest to be paid directly by the financial institu-

tion to the Legal Foundation of Washington (hereinafter the Foundation), a nonprofit entity to be established pursuant to the order following this opinion. New CPR DR 9–102(C)(1), (2).

"3. Determining whether client funds should be deposited in accounts bearing interest for the benefit of the client or the Foundation is left to the discretion of each lawyer, but the new rule specifies that the lawyer shall base his decision solely on whether the funds could be invested to provide a positive net return to the client. This determination is made by considering several enumerated factors: the amount of interest the funds would earn during the period they are expected to be deposited, the cost of establishing and administering the account, and the capability of financial institutions to calculate and pay interest to individual clients. New CPR DR 9–102(C)(3).

.        .        .        .        .

"5. Lawyers and law firms must direct the depository institution to pay interest or dividends, net of any service charges or fees, to the Foundation, and to send certain regular reports to the Foundation and the lawyer or law firm depositing the funds. New CPR DR 9–102(C)(4).

"The Foundation must use all funds received from lawyers' trust accounts for tax-exempt law-related charitable and educational purposes within the meaning of section 501(c)(3) of the Internal Revenue Code, as directed by this court. See Articles of Incorporation and Bylaws of the Legal Foundation of Washington, 100 Wash. 2d, Advance Sheet 13, at ii, vi (1984)." *Id.*, at 1102–1104.

In its opinion the court responded to three objections that are relevant to our inquiry in this case. First, it rejected the contention that the new program "constitutes an uncon-

stitutional taking of property without due process or just compensation." *Id.*, at 1104. Like other State Supreme Courts that had considered the question, it distinguished our decision in *Webb's Fabulous Pharmacies, Inc.* v. *Beckwith,* 449 U. S. 155 (1980), on the ground that the new "'program creates income where there had been none before, and the income thus created would never benefit the client under any set of circumstances.'" 102 Wash. 2d, at 1108 (quoting *In re Interest on Trust Accounts,* 402 So. 2d 389, 395 (Fla. 1981)).

Second, it rejected the argument that it was unethical for lawyers to rely on any factor other than the client's best interests when deciding whether to deposit funds in an IOLTA account rather than an account that would generate interest for the client. The court endorsed, and added emphasis to, the response to that argument set forth in the proponents' reply brief:

> "'Although the proposed amendments list several factors an attorney should consider in deciding how to invest his clients' trust funds, . . . all of these factors are really facets of a single question: Can the client's money be invested so that it will produce a net benefit for the client? If so, the attorney must invest it to earn interest for the client. Only if the money cannot earn net interest for the client is the money to go into an IOLTA account.'
>
> "Reply Brief of Proponents, at 14. This is a correct statement of an attorney's duty under trust law, as well as a proper interpretation of the proposed rule as published for public comment. However, in order to make it even clearer that IOLTA funds are only those funds that *cannot, under any circumstances,* earn *net* interest (after deducting transaction and administrative costs and bank fees) for the client, we have amended the proposed rule accordingly. *See* new CPR DR 9–102(C)(3). The new rule makes it absolutely clear that the enumer-

ated factors are merely facets of the ultimate question of whether client funds could be invested profitably for the benefit of clients. If they can, then investment for the client is mandatory." 102 Wash. 2d, at 1113–1114.

The court also rejected the argument that it had failed to consider the significance of advances in computer technology that, in time, may convert IOLTA participation into an unconstitutional taking of property that could have been distributed to the client. It pointed to the fact that the Rule expressly requires attorneys to give consideration to the capability of financial institutions to calculate and pay interest on individual accounts, and added: "Thus, as cost effective subaccounting services become available, making it possible to earn net interest for clients on increasingly smaller amounts held for increasingly shorter periods of time, more trust money will have to be invested for the clients' benefit under the new rule. The rule is therefore self-adjusting and is adequately designed to accommodate changes in banking technology without running afoul of the state or federal constitutions." Id., at 1114.

Given the court's explanation of its Rule, it seems apparent that a lawyer who mistakenly uses an IOLTA account as a depositary for money that could earn interest for the client would violate the Rule. Hence, the lawyer will be liable to the client for any lost interest, however minuscule the amount might be.

In 1995, the Washington Supreme Court amended its IOLTA Rules to make them applicable to Limited Practice Officers (LPOs) as well as lawyers. LPOs are nonlawyers who are licensed to act as escrowees in the closing of real estate transactions. Like lawyers, LPOs often temporarily control the funds of clients.

## II

This action was commenced by a public interest law firm and four citizens to enjoin state officials from continuing to

require LPOs to deposit trust funds into IOLTA accounts. Because the Court of Appeals held that the firm and two of the individuals do not have standing,[4] *Washington Legal Foundation* v. *Legal Foundation of Washington*, 271 F. 3d 835, 848–850 (CA9 2001), and since that holding was not challenged in this Court, we limit our discussion to the claims asserted by petitioners Allen Brown and Greg Hayes. The defendants, respondents in this Court, are the justices of the Washington Supreme Court, the Foundation, which receives and redistributes the interest on IOLTA accounts, and the president of the Foundation.

In their amended complaint, Brown and Hayes describe the IOLTA program, with particular reference to its application to LPOs and to some of the activities of recipient organizations that have received funds from the Foundation. Brown and Hayes also both allege that they regularly purchase and sell real estate and in the course of such transactions they deliver funds to LPOs who are required to deposit them in IOLTA accounts. They object to having the interest on those funds "used to finance the Recipient Organizations" and "to anyone other than themselves receiving the interest derived from those funds." App. 25. The first count of their complaint alleges that "being forced to associate with the Recipient Organizations" violates their First Amendment rights, *id.*, at 25, 27–28; the second count alleges that the "taking" of the interest earned on their funds in the IOLTA accounts violates the Just Compensation Clause of

---

[4] The firm is the Washington Legal Foundation, "a nonprofit public interest law and policy center with members and supporters nationwide, [that] devotes a substantial portion of its resources to protecting the speech and property rights of individuals from undue government interference." App. 13. The two individuals found to have no standing are LPOs who alleged that the 1995 amendment adversely affected their earnings because banks that had previously provided them with special services no longer did so; they did not allege that any of their own funds had been "taken."

the Fifth Amendment, *id.*, at 28–29; and the third count alleges that the requirement that client funds be placed in IOLTA accounts is "an illegal taking of the beneficial use of those funds," *id.*, at 29. The prayer for relief sought a refund of interest earned on the plaintiffs' money that had been placed in IOLTA accounts, a declaration that the IOLTA Rules are unconstitutional, and an injunction against their enforcement against LPOs. See *id.*, at 30.

Most of the pretrial discovery related to the question whether the 1995 Amendment to the IOLTA Rules had indirectly lessened the earnings of LPOs because LPOs no longer receive certain credits that the banks had provided them when banks retained the interest earned on escrowed funds. Each of the petitioners, however, did identify a specific transaction in which interest on his escrow deposit was paid to the Foundation.

Petitioner Hayes and a man named Fossum made an earnest money deposit of $2,000 on August 14, 1996, and a further payment of $12,793.32 on August 28, 1996, in connection with a real estate purchase that was closed on August 30, 1996. *Id.*, at 117–118. The money went into an IOLTA account. Presumably those funds, half of which belonged to Fossum, were used to pay the sales price, "to pay off liens and obtain releases to clear the title to the property being conveyed." *Id.*, at 98. The record does not explain exactly how or when the ultimate recipients of those funds received or cashed the checks issued to them by the escrowee, but the parties apparently agree that the deposits generated some interest on principal that was at least in part owned by Hayes during the closing.

In connection with a real estate purchase that closed on May 1, 1997, petitioner Brown made a payment of $90,521.29 that remained in escrow for two days, see *id.*, at 53; he estimated that the interest on that deposit amounted to $4.96, but he did not claim that he would have received any interest

if the IOLTA Rules had not been in place.[5]   The record thus suggests, although the facts are not crystal clear, that funds deposited by each of the petitioners generated some interest that was ultimately paid to the Foundation.   It also seems clear that without IOLTA those funds would not have produced any net interest for either of the petitioners.

After discovery, the District Court granted the defendants' motion for summary judgment.   As a factual matter the court concluded "that in no event can the client-depositors make any net returns on the interest accrued in these accounts.   Indeed, if the funds were able to make any net return, they would not be subject to the IOLTA program." *Washington Legal Foundation* v. *Legal Foundation of Washington,* No. C97–0146C (WD Wash., Jan. 30, 1998), App. to Pet. for Cert. 94a.   As a legal matter, the court concluded that the constitutional issue focused on what an owner has lost, not what the "'taker'" has gained, and that petitioners Hayes and Brown had "lost nothing." *Ibid.*

While the case was on appeal, we decided *Phillips* v. *Washington Legal Foundation,* 524 U. S. 156 (1998).   Relying on our opinion in that case, a three-judge panel of the Ninth Circuit decided that the IOLTA program caused a taking of petitioners' property and that further proceedings were necessary to determine whether they are entitled to just compensation.   The panel concluded: "In sum, we hold that the interest generated by IOLTA pooled trust accounts is property of the clients and customers whose money is deposited into trust, and that a government appropriation of that interest for public purposes is a taking entitling them to just compensation under the Fifth Amendment.   But just compensation for the takings may be less than the amount

---

[5] "Q Are you saying that without IOLTA in place you would have earned $4.96 on this transaction?

"A Without IOLTA in place I may not have earned anything but it would have been earned in the sense of earning credits for the title company in this case." *Id.,* at 130.

of the interest taken, or nothing, depending on the circumstances, so determining the remedy requires a remand." *Washington Legal Foundation* v. *Legal Foundation of Washington,* 236 F. 3d 1097, 1115 (2001).

The Court of Appeals then reconsidered the case en banc. 271 F. 3d 835 (CA9 2001). The en banc majority affirmed the judgment of the District Court, reasoning that, under the ad hoc approach applied in *Penn Central Transp. Co.* v. *New York City,* 438 U. S. 104 (1978), there was no taking because petitioners had suffered neither an actual loss nor an interference with any investment-backed expectations, and that the regulation of the use of their property was permissible. Moreover, in the majority's view, even if there were a taking, the just compensation due was zero.

The three judges on the original panel, joined by Judge Kozinski, dissented. In their view, the majority's reliance on *Penn Central* was misplaced because this case involves a "per se" taking rather than a regulatory taking. 271 F. 3d, at 865–866. The dissenters adhered to the panel's view that a remand is necessary in order to decide whether any compensation is due.

In their petition for certiorari, Brown and Hayes asked us not only to resolve the disagreement between the majority and the dissenters in the Ninth Circuit about the taking issue, but also to answer a question that none of those judges reached, namely, whether injunctive relief is available because the small amounts to which they claim they are entitled render recovery through litigation impractical. We granted certiorari. 536 U. S. 903 (2002).

## III

While it confirms the State's authority to confiscate private property, the text of the Fifth Amendment imposes two conditions on the exercise of such authority: the taking must be for a "public use" and "just compensation" must be paid

to the owner.[6]   In this case, the first condition is unquestionably satisfied.   If the State had imposed a special tax, or perhaps a system of user fees, to generate the funds to finance the legal services supported by the Foundation, there would be no question as to the legitimacy of the use of the public's money.[7]   The fact that public funds might pay the legal fees of a lawyer representing a tenant in a dispute with a landlord who was compelled to contribute to the program would not undermine the public character of the "use" of the funds.   Provided that she receives just compensation for the taking of her property, a conscientious pacifist has no standing to object to the government's decision to use the property she formerly owned for the production of munitions. Even if there may be occasional misuses of IOLTA funds, the overall, dramatic success of these programs in serving the compelling interest in providing legal services to literally millions of needy Americans certainly qualifies the Foundation's distribution of these funds as a "public use" within the meaning of the Fifth Amendment.

---

[6] Often referred to as the Just Compensation Clause, the final Clause of the Fifth Amendment provides: "nor shall private property be taken for public use, without just compensation."   It applies to the States as well as the Federal Government.   *Chicago, B. & Q. R. Co.* v. *Chicago*, 166 U. S. 226, 239 (1897).

[7] As the dissenters in the Ninth Circuit observed in their original panel opinion: "IOLTA programs spread rapidly because they were an exceedingly intelligent idea.   Money that lawyers deposited in bank trust accounts always produced earnings, but before IOLTA, the clients who owned the money did not receive any of the earnings that their money produced.   IOLTA extracted the earnings from the banks and gave it to charities, largely to fund legal services for the poor.   That is a very worthy purpose."   236 F. 3d 1097, 1115 (2001).

In his dissent from the en banc opinion, Judge Kozinski wrote: "It is no doubt true that the IOLTA program serves a salutary purpose, one worthy of our support.   As a citizen and former member of the bar, I applaud the state's effort to provide legal services for the poor and disadvantaged." 271 F. 3d 835, 867 (CA9 2001).

Before moving on to the second condition, the "just compensation" requirement, we must address the type of taking, if any, that this case involves. As we made clear just last term:

"The text of the Fifth Amendment itself provides a basis for drawing a distinction between physical takings and regulatory takings. Its plain language requires the payment of compensation whenever the government acquires private property for a public purpose, whether the acquisition is the result of a condemnation proceeding or a physical appropriation. But the Constitution contains no comparable reference to regulations that prohibit a property owner from making certain uses of her private property. Our jurisprudence involving condemnations and physical takings is as old as the Republic and, for the most part, involves the straightforward application of *per se* rules. Our regulatory takings jurisprudence, in contrast, is of more recent vintage and is characterized by 'essentially ad hoc, factual inquiries,' *Penn Central*, 438 U. S., at 124, designed to allow 'careful examination and weighing of all the relevant circumstances.' *Palazzolo* [v. *Rhode Island*], 533 U. S. [606,] 636 [2001] (O'CONNOR, J., concurring).

"When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner, *United States* v. *Pewee Coal Co.*, 341 U. S. 114, 115 (1951), regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof. Thus, compensation is mandated when a leasehold is taken and the government occupies the property for its own purposes, even though that use is temporary. *United States* v. *General Motors Corp.*, 323 U. S. 373 (1945), *United States* v. *Petty Motor Co.*, 327 U. S. 372 (1946). Similarly, when the government appropriates part of a rooftop in order to provide cable TV access for

apartment tenants, *Loretto* v. *Teleprompter Manhattan CATV Corp.*, 458 U. S. 419 (1982); or when its planes use private airspace to approach a government airport, *United States* v. *Causby*, 328 U. S. 256 (1946), it is required to pay for that share no matter how small. But a government regulation that merely prohibits landlords from evicting tenants unwilling to pay a higher rent, *Block* v. *Hirsh*, 256 U. S. 135 (1921); that bans certain private uses of a portion of an owner's property, *Village of Euclid* v. *Ambler Realty Co.*, 272 U. S. 365 (1926); *Keystone Bituminous Coal Assn.* v. *DeBenedictis*, 480 U. S. 470 (1987); or that forbids the private use of certain airspace, *Penn Central Transp. Co.* v. *New York City*, 438 U. S. 104 (1978), does not constitute a categorical taking. 'The first category of cases requires courts to apply a clear rule; the second necessarily entails complex factual assessments of the purposes and economic effects of government actions.' *Yee* v. *Escondido*, 503 U. S. 519, 523 (1992). See also *Loretto*, 458 U. S., at 440; *Keystone*, 480 U. S., at 489, n. 18." *Tahoe-Sierra Preservation Council, Inc.* v. *Tahoe Regional Planning Agency*, 535 U. S. 302, 321–323 (2002).

In their complaint, Brown and Hayes separately challenge (1) the requirement that their funds must be placed in an IOLTA account (Count III) and (2) the later transfers to the Foundation of whatever interest is thereafter earned (Count II). The former is merely a transfer of principal and therefore does not effect a confiscation of any interest. Conceivably it could be viewed as the first step in a "regulatory taking" which should be analyzed under the factors set forth in our opinion in *Penn Central*. Under such an analysis, however, it is clear that there would be no taking because the transaction had no adverse economic impact on petitioners and did not interfere with any investment-backed expectation. See 438 U. S., at 124.

Even the dissenters in the Court of Appeals did not disagree with the proposition that *Penn Central* forecloses the conclusion that there was a regulatory taking effected by the Washington IOLTA program. In their view, however, the proper focus was on the second step, the transfer of interest from the IOLTA account to the Foundation. It was this step that the dissenters likened to the kind of *"per se"* taking that occurred in *Loretto* v. *Teleprompter Manhattan CATV Corp.,* 458 U. S. 419 (1982).

We agree that a *per se* approach is more consistent with the reasoning in our *Phillips* opinion than *Penn Central's* ad hoc analysis. As was made clear in *Phillips,* the interest earned in the IOLTA accounts "is the 'private property' of the owner of the principal." 524 U. S., at 172. If this is so, the transfer of the interest to the Foundation here seems more akin to the occupation of a small amount of rooftop space in *Loretto.*

We therefore assume that Brown and Hayes retained the beneficial ownership of at least a portion of their escrow deposits until the funds were disbursed at the closings, that those funds generated some interest in the IOLTA accounts, and that their interest was taken for a public use when it was ultimately turned over to the Foundation. As the dissenters in the Ninth Circuit explained, though, this does not end our inquiry. Instead, we must determine whether any "just compensation" is due.

## IV

"The Fifth Amendment does not proscribe the taking of property; it proscribes taking without just compensation." *Williamson County Regional Planning Comm'n* v. *Hamilton Bank of Johnson City,* 473 U. S. 172, 194 (1985). All of the Circuit Judges and District Judges who have confronted the compensation question, both in this case and in *Phillips,* have agreed that the "just compensation" required by the Fifth Amendment is measured by the property owner's loss

rather than the government's gain. This conclusion is supported by consistent and unambiguous holdings in our cases.

Most frequently cited is Justice Holmes' characteristically terse statement that "the question is what has the owner lost, not what has the taker gained." *Boston Chamber of Commerce* v. *Boston*, 217 U. S. 189, 195 (1910). Also directly in point is Justice Brandeis' explanation of why a mere technical taking does not give rise to an obligation to pay compensation:

> "We have no occasion to determine whether in law the President took possession and assumed control of the Marion & Rye Valley Railway. For even if there was technically a taking, the judgment for defendant was right. Nothing was recoverable as just compensation, because nothing of value was taken from the company; and it was not subjected by the Government to pecuniary loss." *Marion & Rye Valley R. Co.* v. *United States*, 270 U. S. 280, 282 (1926).

A few years later we again noted that the private party "is entitled to be put in as good a position pecuniarily as if his property had not been taken. He must be made whole but is not entitled to more." *Olson* v. *United States*, 292 U. S. 246, 255 (1934).

In *Kimball Laundry Co.* v. *United States*, 338 U. S. 1 (1949), although there was disagreement within the Court concerning the proper measure of the owner's loss when a leasehold interest was condemned, it was common ground that the government should pay "not for what it gets but for what the owner loses." *Id.*, at 23 (Douglas, J., dissenting). Moreover, in his opinion for the majority, Justice Frankfurter made it clear that, given "the liability of all property to condemnation for the common good," an owner's nonpecuniary losses attributable to "his unique need for property or idiosyncratic attachment to it, like loss due to an exercise of

the police power, is properly treated as part of the burden of common citizenship." *Id.*, at 5.

Applying the teaching of these cases to the question before us, it is clear that neither Brown nor Hayes is entitled to any compensation for the nonpecuniary consequences of the taking of the interest on his deposited funds, and that any pecuniary compensation must be measured by his net losses rather than the value of the public's gain. For that reason, both the majority[8] and the dissenters[9] on the Court of Appeals agreed that if petitioners' net loss was zero, the compensation that is due is also zero.

## V

Posing hypothetical cases that explain why a lawyer might mistakenly deposit funds in an IOLTA account when those funds might have produced net earnings for the client, the Ninth Circuit dissenters concluded that a remand of this case is necessary to decide whether petitioners are entitled to any compensation.

> "Even though when funds are deposited into IOLTA accounts, the lawyers expect them to earn less than it would cost to distribute the interest, that expectation can turn out to be incorrect, as discussed above. Several hypothetical cases illustrate the complexities of the remedies, which need further factual development on remand. Suppose $2,000 is deposited into a lawyer's trust account paying 5% and stays there for two days. It earns about $.55, probably well under the cost of a stamp and envelope, along with clerical expenses, needed to send the $.55 to the client. In that case, the client's financial loss from the taking, if a reasonable charge is

---

[8] "We therefore hold that even if the IOLTA program constituted a taking of Brown's and Hayes's private property, there would be no Fifth Amendment violation because the value of their just compensation is nil." 271 F. 3d, at 864.

[9] *Id.*, at 883–884.

made for the administrative expense, is nothing. The fair market value of a right to receive $.55 by spending perhaps $5.00 to receive it would be nothing. On the other hand, suppose, hypothetically, that the amount deposited into the trust account is $30,000, and it stays there for 6 days. The client's loss here would be about $29.59 if he does not get the interest, which may well exceed the reasonable administrative expense of paying it to him out of a common fund. It is hard to see how just compensation could be zero in this hypothetical taking, even though it would be in the $2,000 for 2 days hypothetical taking. It may be that the difference between what a pooled fund earns, and what the individual clients and escrow companies lose, adds up to enough to sustain a valuable IOLTA program while not depriving any of the clients and customers of just compensation for the takings. This is a practical question entirely undeveloped on this record. We leave it for the parties to consider during the remedial phase of this litigation." 271 F. 3d, at 883.[10]

---

[10] The first hypothetical posed by the Ninth Circuit dissenters illustrates the fundamental flaw in JUSTICE SCALIA's approach to this case. Under his view that just compensation should be measured by the gross amount of the interest taken by the State, the client should recover the $.55 of interest earned on a 2-day deposit even when the transaction costs amount to $2.00. Thus, in this case, under JUSTICE SCALIA's approach, even if it is necessary to incur substantial legal and accounting fees to determine how many pennies of interest were earned while petitioners' funds remained in escrow and how much of that interest belonged to them rather than to the sellers, the Constitution would require that they be paid the gross amount of that interest, rather than an amount equal to their net loss (which, of course, is zero). As explained above, this is inconsistent with the Court's just compensation precedents. See *supra*, at 235–237.

Ironically, JUSTICE SCALIA seems to believe that our holding in *Webb's Fabulous Pharmacies, Inc.* v. *Beckwith*, 449 U. S. 155 (1980), would support such a bizarre result. In *Webb's*, however, the transaction cost that is comparable to the postage in the Ninth Circuit's hypothetical (and to the potential professional fees in this case) is the clerk's fee of $9,228.74,

These hypotheticals persuade us that lawyers and LPOs may occasionally deposit client funds in an IOLTA account when those funds could have produced net interest for their clients. It does not follow, however, that there is a need for further hearings to determine whether Brown or Hayes is entitled to any compensation from the respondents.

The Rules adopted and administered by the Washington Supreme Court unambiguously require lawyers and LPOs to deposit client funds in non-IOLTA accounts whenever those funds could generate net earnings for the client. See *supra*, at 224–225. Thus, if the LPOs who deposited petitioners' money in IOLTA accounts could have generated net income, the LPOs violated the court's Rules. Any conceivable net loss to petitioners was the consequence of the LPOs' incorrect private decisions rather than any state action. Such mistakes may well give petitioners a valid claim against the LPOs, but they would provide no support for a claim for compensation from the State, or from any of the respondents. The District Court was therefore entirely correct when it made the factual finding "that in no event can the client-depositors make any net return on the interest accrued in

which was deducted from the amount held in the interpleader fund. See *id.*, at 157, 160. The creditors in *Webb's* recovered an amount equal to their net loss. Indeed, in *Webb's* we expressly limited our holding to "the narrow circumstances of this case," *id.*, at 164, and reserved decision on the question whether any compensation would have been due if the clerk had not charged a separate fee. See *id.*, at 164–165.

JUSTICE SCALIA is mistaken in stating that we hold that just compensation is measured by the amount of interest "petitioners *would have earned* had their funds been deposited in *non-IOLTA* accounts." *Post*, at 244 (dissenting opinion). We hold (1) that just compensation is measured by the net value of the interest that was actually earned by petitioners and (2) that, by operation of the Washington IOLTA Rules, no net interest can be earned by the money that is placed in IOLTA accounts in Washington. See *IOLTA Adoption Order*, 102 Wash. 2d 1101, 1114 (1984) ("IOLTA funds are only those funds that *cannot, under any circumstances*, earn *net* interest (after deducting transaction and administrative costs and bank fees) for the client").

these accounts. Indeed, if the funds were able to make any net return, they would not be subject to the IOLTA program." No. C97–0146C (WD Wash., Jan. 30, 1998), App. to Pet. for Cert. 94a.

The categorical requirement in Washington's IOLTA program that mandates the choice of a non-IOLTA account when net interest can be generated for the client provided an independent ground for the en banc court's judgment. It held that the program did "not work a constitutional violation with regard to Brown's and Hayes's property: Even if their property was taken, the Fifth Amendment only protects against a taking without just compensation. Because of the way the IOLTA program operates, the compensation due Brown and Hayes for any taking of their property would be nil. There was therefore no constitutional violation when they were not compensated." 271 F. 3d, at 861–862.

We agree with that holding.[11]

## VI

To recapitulate: It is neither unethical nor illegal for lawyers to deposit their clients' funds in a single bank account. A state law that requires client funds that could not otherwise generate net earnings for the client to be deposited in an IOLTA account is not a "regulatory taking." A law that requires that the interest on those funds be transferred to a different owner for a legitimate public use, however, could be a *per se* taking requiring the payment of "just compensation" to the client. Because that compensation is measured by the owner's pecuniary loss—which is zero whenever the Washington law is obeyed—there has been no violation of the Just Compensation Clause of the Fifth Amendment in this case. It is therefore unnecessary to discuss the reme-

---

[11] Contrary to JUSTICE SCALIA's assertion, this conclusion does not depend on the fact that interest "was created by the beneficence of a state regulatory program." *Post*, at 241. It rests instead on the fact that just compensation for a net loss of zero is zero.

dial question presented in the certiorari petition. Accordingly, the judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE SCALIA, with whom THE CHIEF JUSTICE, JUSTICE KENNEDY, and JUSTICE THOMAS join, dissenting.

The Court today concludes that the State of Washington may seize private property, without paying compensation, on the ground that the former owners suffered no "net loss" because their confiscated property was created by the beneficence of a state regulatory program. In so holding the Court creates a novel exception to our oft-repeated rule that the just compensation owed to former owners of confiscated property is the fair market value of the property taken. What is more, the Court embraces a line of reasoning that we explicitly rejected in *Phillips* v. *Washington Legal Foundation,* 524 U. S. 156 (1998). Our precedents compel the conclusion that petitioners are entitled to the fair market value of the interest generated by their funds held in interest on lawyers' trust accounts (IOLTA). I dissent from the Court's judgment to the contrary.

I

In 1984 the Supreme Court of Washington issued an order requiring lawyers to place all client trust funds in "identifiable interest-bearing trust accounts." App. 150. If a client's funds can be invested to provide a "positive net return" to the client, the lawyer must place the funds in an account that pays interest to the client. If the client's funds cannot earn a "positive net return" for the client, the funds are to be deposited in a pooled interest-bearing IOLTA account with the interest payable to the Legal Foundation of Washington (LFW), a nonprofit organization that provides legal services for the indigent. A lawyer is not required to obtain his client's consent, or even notify his client, regarding the

use of client funds in IOLTA accounts or the payment of interest to LFW. *Id.*, at 151. The Supreme Court of Washington dismissed all constitutional objections to its 1984 order on the now-discredited ground that any interest that might be earned on IOLTA accounts would not be "property" of the clients. *Id.*, at 158; cf. *Phillips, supra.*

As the Court correctly notes, Washington's IOLTA program comprises two steps: First, the State mandates that certain client trust funds be placed in an IOLTA account, where those funds generate interest. Second, the State seizes the interest earned on those accounts to fund LFW. *Ante*, at 234. With regard to step one, we held in *Phillips, supra,* that any interest earned on client funds held in IOLTA accounts belongs to the owner of the principal, not the State or the State's designated recipient of the interest. As to step two, the Court assumes, *arguendo*, that the appropriation of petitioners' interest constitutes a "taking,"[1] but holds that just compensation is zero because without the mandatory pooling arrangements (step one) of IOLTA, petitioners' funds could not have generated any interest in the first place.[2] *Ante*, at 239–240. This holding contravenes our

---

[1] Although the Ninth Circuit concluded that Washington's IOLTA scheme did not constitute a "taking" of petitioners' property, *Washington Legal Foundation* v. *Legal Foundation of Wash.*, 271 F. 3d 835, 861 (2001), the Court does not attempt to defend this aspect of the decision. *Ante*, at 235.

[2] The Court's ruminations on whether the State's IOLTA program satisfies the Fifth Amendment's "public use" requirement, *ante*, at 231–232, come as a surprise, inasmuch as they address a nonjurisdictional constitutional issue raised by neither the parties nor their *amici.* Petitioners' sole contention in this Court is that the State's IOLTA program violates the just compensation requirement of the Takings Clause. Brief for Petitioners 18–48; Reply Brief for Petitioners 1–20.

In needlessly addressing this issue, the Court announces a new criterion for "public use": The requirement is "unquestionably satisfied" if the State could have raised funds for the same purpose through a "special tax" or a "system of user fees," *ante*, at 232. This reduces the "public use" requirement to a negligible impediment indeed, since I am unaware of *any* use

decision in *Phillips*—effectively refusing to treat the interest as the property of petitioners we held it to be—and brushes aside 80 years of precedent on determining just compensation.

## II

·When a State has taken private property for a public use, the Fifth Amendment requires compensation in the amount of the market value of the property on the date it is appropriated. See *United States* v. *50 Acres of Land,* 469 U. S. 24, 29 (1984) (holding that just compensation is "'market value of the property *at the time of the taking*'" (emphasis added) (quoting *Olson* v. *United States,* 292 U. S. 246, 255 (1934))); *Kirby Forest Industries, Inc.* v. *United States,* 467 U. S. 1, 10 (1984); *United States* v. *564.54 Acres of Monroe and Pike County Land,* 441 U. S. 506, 511 (1979); *Almota Farmers Elevator & Warehouse Co.* v. *United States,* 409 U. S. 470, 474 (1973); *United States* v. *Commodities Trading Corp.,* 339 U. S. 121, 130 (1950); *United States* v. *New River Collieries Co.,* 262 U. S. 341, 344 (1923). As we explained in *United States* v. *Petty Motor Co.,* 327 U. S. 372, 377 (1946), "just compensation . . . is not the value to the owner for his particular purposes or to the condemnor for some special use

---

to which state taxes cannot constitutionally be devoted. The money thus derived may be given to the poor, or to the rich, or (insofar as the Federal Constitution is concerned) to the girlfriend of the retiring Governor. Taxes and user fees, since they are not "takings," see *United States* v. *Sperry Corp.,* 493 U. S. 52, 63 (1989), are simply not subject to the "public use" requirement, and so their constitutional legitimacy is entirely irrelevant to the existence *vel non* of a public use.

By raising the analogy of a tax or user fee the Court does, however, usefully call attention to one of the more offensive features of the takings scheme devised by the Washington Supreme Court: A tax or user fee would be enacted by a democratically elected legislature. The IOLTA scheme, by contrast, circumvents politically accountable decisionmaking, and effects a taking of clients' funds through application of a rule purportedly regulating professional ethics, promulgated by the Washington Supreme Court. (The taking has nothing to do with ethics, of course.)

but a so-called 'market value.'" Our cases have recognized only two situations in which this standard is not to be used: when market value is too difficult to ascertain, and when payment of market value would result in "'manifest injustice'" to the owner or the public. See *Kirby Forest Industries, Inc., supra,* at 10, n. 14.

In holding that any just compensation that might be owed is zero, the Court neither pretends to ascertain the market value of the confiscated property nor asserts that the case falls within one of the two exceptions where market value need not be determined. Instead, the Court proclaims that just compensation is to be determined by the former property owner's "net loss," and endorses simultaneously two competing and irreconcilable theories of how that loss should be measured. The Court proclaims its agreement with the Ninth Circuit majority that just compensation is the interest petitioners *would have earned* had their funds been deposited in *non-IOLTA* accounts. *Ante,* at 239–240. See also 271 F. 3d 835, 862 (CA9 2001) ("[W]ithout IOLTA, neither Brown nor Hayes would have earned interest on his principal because by regulatory definition, their funds would have not otherwise been placed in an IOLTA account"). At the same time, the Court approves the view of the Ninth Circuit *dissenters* that just compensation is the amount of interest *actually earned* in petitioners' IOLTA accounts, minus the amount that would have been lost in transaction costs had petitioners sought to keep the money for themselves. *Ante,* at 238–239, n. 10. The Court cannot have it both ways—as the Ninth Circuit itself realized—but even if it could, neither of the two options from which lower courts may now choose is consistent with *Phillips* or our precedents that equate just compensation with the fair market value of the property taken.

## A

Under the Court's first theory, just compensation is zero because, under the State Supreme Court's Rules, the only

funds placed in IOLTA accounts are those which could not have earned net interest for the client *in a non-IOLTA* savings account. App. 150. This approach defines petitioners' "net loss" as the amount of interest they would have received had their funds been deposited in separate, non-IOLTA accounts. See *ante,* at 239 ("[I]f the [Limited Practice Officers (LPOs)] who deposited petitioners' money in IOLTA accounts could have generated net income, the LPOs violated the court's Rules. Any conceivable net loss to petitioners was the consequence of the LPOs' incorrect private decisions rather than any state action").

This definition of just compensation has no foundation in reason. Once interest is earned on petitioners' funds held in IOLTA accounts, that money is petitioners' property. See *Phillips,* 524 U. S., at 168 ("[A]ny interest that *does* accrue attaches as a property right incident to the ownership of the underlying principal"). It is at *that* point that the State appropriates the interest to fund LFW—*after* the interest has been generated in the pooled accounts—and it is at *that* point that just compensation for the taking must be assessed. It may very well be, as the Court asserts, that petitioners could not have earned money on their funds absent IOLTA's mandatory pooling arrangements, but just compensation is not to be measured by what would have happened in a hypothetical world in which the State's IOLTA program did not exist. When the State takes possession of petitioners' property—petitioners' money—and transfers it to LFW, the property obviously has *value.* The conclusion that it is devoid of value because of the circumstances giving rise to its creation is indefensible.

Consider the implications of the Court's approach for a case such as *Webb's Fabulous Pharmacies, Inc.* v. *Beckwith,* 449 U. S. 155 (1980), which involved a Florida statute that allowed the clerk of a court, in his discretion, to invest interpleader funds deposited with that court in interest-bearing certificates, the interest earned to be deemed "'income of

the office of the clerk of the circuit court.'" *Id.*, at 156, n. 1 (quoting Fla. Stat. § 28.33 (1977)). The appellant in *Webb's* had tendered nearly $2 million to a state court after filing an interpleader action, and we held that the state court's retention of the more than $100,000 in interest generated by those funds was an uncompensated taking of private property.[3]  449 U. S., at 164.

But what would have been just compensation for the taking in *Webb's* under today's analysis?  It would consist not of the amount of interest *actually earned* by the principal, but rather of the amount that *would have been earned* had the State not provided for the clerk of court to generate the interest in the first place.  That amount would have been zero since, as we noted in *Webb's*, Florida law did not require that interest be earned on a registry deposit, *id.*, at 161. Section 28.33's authorization for the clerk of court to invest the interpleader funds, like the Washington Supreme Court's IOLTA scheme, was a state-created opportunity to generate interest on moneys that would otherwise lie fallow.  As the Florida Supreme Court observed, "[i]nterest accrues *only because of section 28.33.*  In this sense the statute takes only what it creates." *Beckwith* v. *Webb's Fabulous Pharmacies, Inc.*, 374 So. 2d 951, 953 (1979) (emphasis added).

In *Webb's* this Court *unanimously* rejected the contention that a state regulatory scheme's generation of interest that

---

[3] A *separate* Florida statute, Fla. Stat. § 28.24 (1977), which was not even challenged in *Webb's*, 449 U. S., at 158, provided that the Clerk of the Circuit Court would make "charges for services rendered," including charges for receiving money into the registry of court, § 28.24(14).  These charges were *not* deducted from the gross interest earned, as the Court suggests, *ante*, at 238–239, n. 10, but from the *principal*, before any interest had been generated on the interpleader fund.  See 449 U. S., at 157–158.  The creditors in *Webb's* sued to recover the *entire interest* that had been earned on the fund pursuant to § 28.33, *id.*, at 158, and we held that "*any interest* on an interpleaded and deposited fund follows the principal and is to be allocated to those who are ultimately to be the owners of that principal," *id.*, at 162.

would otherwise not have come into existence gave license for the State to claim the interest for itself. What can possibly explain the contrary holding today? Surely it cannot be that the Justices look more favorably upon a nationally emulated uncompensated taking of clients' funds to support (hurrah!) legal services to the indigent than they do upon a more local uncompensated taking of clients' funds to support nothing more inspiring than the Florida circuit courts. That were surely an unprincipled distinction. But the real, principled basis for the distinction remains to be disclosed. And until it is disclosed, today's endorsement of the proposition that there is no taking when "the State giveth, and the State taketh away," has potentially far-reaching consequences. May the government now seize welfare benefits, without paying compensation, on the ground that there was no "net los[s]," *ante,* at 237, to the recipient? Cf. *Goldberg* v. *Kelly,* 397 U. S. 254 (1970).[4]

What is more, the Court's reasoning calls into question our holding in *Phillips* that interest generated on IOLTA accounts is the "private property" of the owners of the principal. An ownership interest encumbered by the right of the government to seize moneys for itself or transfer them to the nonprofit organization of its choice is not compatible with any notion of "private property." True, the Fifth Amendment allows the government to appropriate private property without compensation if the market value of the property is zero (and if it is taken for a "public use"). But

---

[4] The Court claims that its holding "does not depend on the fact that interest was created by a state regulatory program," and "rests instead on the fact that just compensation for a net loss of zero is zero." *Ante,* at 240, n. 11 (internal quotation marks omitted). This simply disclaims the ultimate ground by appealing to the proximate ground: The *reason* the Court finds there has been a "a net loss of zero" is that the interest on petitioners' funds is entirely attributable to the merging of those funds into the IOLTA account—*but for* IOLTA, they would have earned no interest at all. That is to say, no compensation is due on the interest because the "interest was created by a state regulatory program."

the Court does not defend the State's action on the ground that the money taken is worthless, but instead on the ground that the interest would not have been created but for IOLTA's mandatory pooling arrangements. The Court thereby embraces precisely the line of argument we rejected in *Phillips:* that the interest earned on client funds in IOLTA accounts could not be deemed "private property" of the clients because those funds "cannot reasonably be expected to generate interest income on their own." 524 U. S., at 169 (internal quotation marks omitted); cf. *id.,* at 183 (BREYER, J., dissenting).

## B

The Court's rival theory for explaining why just compensation is zero fares no better. Contrary to its aforementioned description of petitioners' "net loss" as the amount their funds would have earned in non-IOLTA accounts, *ante,* at 239–240, the Court declares that just compensation is "the *net value* of the interest that was *actually earned* by petitioners," *ante,* at 239, n. 10 (emphasis added)—net value consisting of the value of the funds, *less* "transaction and administrative costs and bank fees" that would be expended in extracting the funds from the IOLTA accounts, *ibid.* To support this concept of "net value," the Court cites nothing but the cases discussed earlier in its opinion, *ante,* at 235–237, which establish that just compensation consists of the value the owner has lost rather than the value the government has gained. In this case, however, there is *no difference* between the two. Petitioners have lost the interest that *Phillips* says rightfully belongs to them—which is precisely what the government has gained. The Court's apparent fear that following the Constitution in this case will provide petitioners a "windfall" in the amount of transaction costs saved is based on the unfounded assumption that the State must return the interest directly to petitioners. The State could satisfy its obligation to pay just compensation by simply returning petitioners' money to the IOLTA account

from which it was seized, leaving others to incur the accounting costs in the event petitioners seek to extract their interest from the account.

In any event, our cases that have distinguished the "property owner's loss" from the "government's gain" say *nothing whatever* about reducing this value to some "net" amount. Remarkably, the Court does not cite the recent case of ours that *specifically addresses* this issue, and that does so in the very context of an IOLTA-type scheme. *Phillips* flatly rejected the notion that just compensation may be reduced by transaction costs the former owner would have sustained in retaining his property. See 524 U. S., at 170 ("The government may not seize rents received by the owner of a building simply because it can prove that the costs incurred in collecting the rents exceed the amount collected");[5] see also *Olson* v. *United States*, 292 U. S., at 255 ("It is the property and not the cost of it that is safeguarded by [the] Constitutio[n]").

---

[5] All the Court can muster in response to *Phillips'* rejection of its view that the government may seize property for which the administrative costs of retention exceed market value is a hypothetical posed by the Ninth Circuit dissenters in support of their suggestion to remand. *Ante*, at 238–239, n. 10. The doctrine of *stare decisis* adopts a different hierarchy: This Court's precedents are to be followed over dissenting opinions in the Courts of Appeals.

The Court also suggests that the confiscation of petitioners' property is "comparable to" the clerk's fee under Fla. Stat. § 28.24 (1977), which we discussed in *Webb's Fabulous Pharmacies, Inc.* v. *Beckwith*, 449 U. S. 155 (1980). *Ante*, at 238–239, n. 10. The clerk's fee imposed pursuant to § 28.24(14) had nothing to do with "transaction costs" but was a fee *for services rendered by the State itself*. 449 U. S., at 157. Here, the State does not even attempt to characterize its retention of petitioners' interest in that fashion. While petitioners, their escrow companies, and the banks holding their funds may very well incur costs in returning the IOLTA-generated interest to the clients, this does not convert the State's seizure into a fee. In any event, as noted earlier, *supra*, at 246, n. 3, we neither approved nor disapproved the State's retention of fees pursuant to § 28.24(14) in *Webb's* because the parties did not challenge it. 449 U. S., at 158.

And if the Federal Government seizes someone's paycheck, it may not deduct from its obligation to pay just compensation the amount that state and local governments would have taxed, on the ground that it need only compensate the "net los[s]," *ante,* at 237, to the former owner. That is why we have repeatedly held that just compensation is the "market value" of the confiscated property, rather than the "net loss" to the owner. "Market value" is not reduced by what the owner would have lost in taxes or other exactions. " '[J]ust compensation' means the full monetary equivalent of the property taken." *United States* v. *Reynolds,* 397 U. S. 14, 16 (1970).

But the irrationality of this aspect of the Court's opinion does not end with its blatant contradiction of a precedent *(Phillips)* promulgated by a Court consisting of the same Justices who sit today. Even if "net value" (rather than "market value") *were* the appropriate measure of just compensation, the Court has no basis whatsoever for pronouncing the "net value" of petitioners' interest to be zero. While the Court is correct that under the State's IOLTA rules, petitioners' funds could not have earned net interest *in separate, non-IOLTA accounts, ante,* at 238–239, n. 10, that has no bearing on the transaction costs that petitioners would sustain in removing their earned interest from the IOLTA accounts.[6] The Court today arbitrarily forecloses clients from

---

[6] The Court quotes the Washington Supreme Court's definition of IOLTA funds as "only those funds that cannot, under any circumstances, earn net interest (after deducting transaction and administrative costs and bank fees) for the client." *Ante,* at 239, n. 10 (quoting *IOLTA Adoption Order,* 102 Wash. 2d 1101, 1114 (1984) (emphasis deleted)). It is true that IOLTA funds cannot earn net interest for the client *in non-IOLTA accounts,* and, prior to our decision in *Phillips* v. *Washington Legal Foundation,* 524 U. S. 156 (1998), also could not earn net interest for the client in IOLTA accounts because state law declared such interest to be the property of LFW. After *Phillips,* however, IOLTA funds *can* earn net interest for the client when placed in IOLTA accounts—because all interest earned by funds in IOLTA accounts is the client's property. See *id.,* at 160.

recovering the "net interest" to which (even under the Court's definition of just compensation) they are entitled. What is more, there is no reason to believe that petitioners themselves do not fall within the class of clients whose funds, though unable to earn interest in non-IOLTA accounts, nevertheless generate "net interest" in IOLTA accounts. That is why the Ninth Circuit dissenters (who shared the Court's second theory of just compensation but not the first) voted to remand to the District Court for a factual determination of what the "net value" of petitioners' interest actually is.

To confuse confusion yet again, the Court justifies its decision *not* to remand by simply falling back upon the *different* theory of just compensation espoused by the Ninth Circuit *majority*—namely, that just compensation will always be zero because the funds would not have earned interest for the clients in a *non-IOLTA* savings account. *Ante*, at 239–240. See also 271 F. 3d, at 862 ("Brown and Hayes are in actuality seeking compensation for the value added to their property by Washington's IOLTA program"). That does not conform, of course, with the Court's previously announced standard for just compensation: "the net value of the interest that was *actually earned* by petitioners." *Ante*, at 239, n. 10 (emphasis added).[7] Assessing the "net value" of inter-

---

[7] In this *reprise* of its first theory, designed to cover the embarrassing fact that its second theory does not support its disposition, the Court makes the assertion that, even if some lawyer mistakenly placed into the IOLTA account client funds that *could* have generated net earnings independently (thus rendering even the Court's first theory factually inapplicable), compensation would *still* not be required, because "[a]ny conceivable net loss [would be] the consequence of the [lawyer's] incorrect private decisio[n] rather than any state action." *Ante*, at 239. That is surely not correct. Even on the Court's own misbegotten theory, the taking occurs when the IOLTA interest is transferred to LFW, and compensation is not payable only if the principal generating that interest could not have earned interest otherwise. How the principal got into the IOLTA account—mistakenly or otherwise—has nothing to do with whether there has been a "taking" of "value." The government would owe just compensation for a taking of real property even if the action of some third party

est "actually earned" requires a factual determination of the costs petitioners would incur if they sought to keep the IOLTA-generated interest for themselves.  By refusing to undertake this inquiry, the Court reveals that its contention that the value of interest "actually earned" is the measure of just compensation is a facade.  The Court's affirmance of the decision below can only rest on the reasoning adopted by the Ninth Circuit majority (notwithstanding its rejection in *Phillips*): that property created by virtue of a state regulatory program may be taken without compensation.

\*   \*   \*

Perhaps we are witnessing today the emergence of a whole new concept in Compensation Clause jurisprudence: the Robin Hood Taking, in which the government's extraction of wealth from those who own it is so cleverly achieved, and the object of the government's larcenous beneficence is so highly favored by the courts (taking from the rich to give to indigent defendants) that the normal rules of the Constitution protecting private property are suspended.  One must hope that that is the case.  For to extend to the entire run of Compensation Clause cases the rationale supporting today's judgment—what the government hath given, the government may freely take away—would be disastrous.

The Court's judgment that petitioners are not entitled to the market value of their confiscated property has no basis in law.  I respectfully dissent.

---

had caused the property mistakenly to be included on the list of properties scheduled for condemnation.  The notion that the government can keep the property without compensation, and relegate the owner to his remedies against the private party, is nothing short of bizarre.  Imagine the fruitful application of this principle of "intervening private fault" in other fields: "Yes, you were subjected to a brutally unlawful search and seizure in connection with our raid upon a street corner where drugs were being distributed.  But since the only reason you were at that corner is that a taxi dropped you at the wrong address, you must look to Yellow Cab for your remedy."

JUSTICE KENNEDY, dissenting.

The principal dissenting opinion, authored by JUSTICE SCALIA, sets forth a precise, complete, and convincing case for rejecting the holding and analysis of the Court. I join the dissent in full.

It does seem appropriate to add this further observation. By mandating that the interest from these accounts serve causes the justices of the Washington Supreme Court prefer, the State not only takes property in violation of the Fifth and Fourteenth Amendments to the Constitution of the United States but also grants to itself a monopoly which might then be used for the forced support of certain viewpoints. Had the State, with the help of Congress, not acted in violation of its constitutional responsibilities by taking for itself property which all concede to be that of the client, *ante*, at 235; *Phillips* v. *Washington Legal Foundation*, 524 U. S. 156, 172 (1998), the free market might have created various and diverse funds for pooling small interest amounts. These funds would have allowed the true owners of the property the option to express views and policies of their own choosing. Instead, as these programs stand today, the true owner cannot even opt out of the State's monopoly.

The First Amendment consequences of the State's action have not been addressed in this case, but the potential for a serious violation is there. See *Abood* v. *Detroit Bd. of Ed.*, 431 U. S. 209 (1977); *Keller* v. *State Bar of Cal.*, 496 U. S. 1 (1990). Today's holding, then, is doubly unfortunate. One constitutional violation (the taking of property) likely will lead to another (compelled speech). These matters may have to come before the Court in due course.