**Ronald J. SMOLOW, Individually and on behalf of all persons and entities similarly situated, Plaintiff,**

v.

**Barbara HAFER, Treasurer of the Commonwealth of Pennsylvania, Defendant.**

**Civil Action No. 04–941.**

United States District Court, E.D. Pennsylvania.

June 25, 2007.

Ann M. Caldwell, Caldwell Law Office LLC, Philadelphia, PA, for Plaintiff.

Daniel J. Doyle, Office of Attorney General, Harrisburg, PA, for Defendant.

## *MEMORANDUM*

JAN E. DuBOIS, District Judge.

## I. INTRODUCTION

Plaintiff, Ronald J. Smolow, filed this class action against Barbara Hafer, Treasurer of the Commonwealth of Pennsylvania, for failing to pay him interest allegedly earned on his property confiscated pursuant to the Disposition of Abandoned and Unclaimed Property Act ("DAUPA"), 72 Pa.S. § 1301.1, *et seq.* Plaintiff asserts that DAUPA, which has been interpreted as not requiring payment of interest when property delivered to the Pennsylvania Department of Treasury ("Treasury") is returned, violates the Just Compensation and Due Process Clauses of the United States Constitution. Presently before the Court are: (1) Plaintiff's Motion *In Limine* to Exclude Portions of the Expert Report and Testimony of John S. Stoner; (2) Plaintiff's Motion for Summary Judgment; and (3) Defendant's Motion for Summary Judgment.

The Court concludes that the challenged portions of Mr. Stoner's expert report and testimony are admissible, and considers all such evidence in ruling on the cross-motions for summary judgment. Thus, plaintiff's motion *in limine* is denied.

The Court further concludes that the Just Compensation and Due Process Clauses do not require Treasury to pay interest to plaintiff. The decision on this issue as presented in the cross-motions for summary judgment turns on the question whether the interest earned on plaintiff's property exceeded the cost of handling the property and processing plaintiff's claim, such that plaintiff suffered a "net loss." Because the Court concludes that interest earned on plaintiff's property did not exceed the cost of handling the property and that, as a result, plaintiff suffered no net loss, plaintiff's motion for summary judg-

ment is denied, and defendant's motion for summary judgment is granted as to plaintiff Smolow. The Court does not reach the issue of whether a taking occurs where a plaintiff does sustain a net loss as a result of DAUPA.

The Court's ruling is without prejudice to plaintiff's right to substitute a new class representative(s); leave is given to do so within twenty (20) days.

## II. PROCEDURAL HISTORY

Two previous opinions set forth the procedural history of this case. *Smolow v. Hafer*, 353 F.Supp.2d 561 (E.D.Pa.2005); *Smolow v. Hafer*, 2005 WL 1377849, *1–2 (E.D.Pa. June 8, 2005). Accordingly, this Memorandum recites only the procedural history and facts necessary to resolve the instant motions.

On May 3, 2004, plaintiff filed this class action against Barbara Hafer, Treasurer of the Commonwealth of Pennsylvania. In his Amended Class Action Complaint, filed May 11, 2004, plaintiff alleged violation of the DAUPA, state common law and constitutional claims. Plaintiff also alleged federal constitutional claims for unlawful taking without just compensation and violation of his substantive and procedural due process rights. On May 8, 2004, plaintiff filed a class action in the Commonwealth Court of Pennsylvania alleging almost identical state and federal law claims.

On January 24, 2005, this Court issued a Memorandum and Order granting defendant's Motion to Dismiss plaintiff's state law claims and request for restitution, and denying the Motion with respect to plaintiff's federal constitutional claims and request for prospective relief. In so ruling, the Court abstained from further adjudication of plaintiff's remaining federal claims and stayed all further proceedings pursuant to the doctrine announced in *R.R. Comm'n of Texas v. Pullman Co.*, 312 U.S.

496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), "pending a determination in the courts of the Commonwealth of Pennsylvania as to whether the DAUPA, 72 Pa.S. 1301.01 et seq., requires the payment of interest earned upon property confiscated pursuant to that Act." *Smolow*, 353 F.Supp.2d at 576.

On February 9, 2005, the Commonwealth Court sustained defendant's preliminary objections and dismissed plaintiff's action in state court, holding, *inter alia*, that the DAUPA did not require the Treasury to pay interest on confiscated property. *Smolow v. Hafer*, 867 A.2d 767, 776 (Pa.Cmwlth.2005). The Commonwealth Court also ruled that plaintiff had abandoned his property and, citing federal authority, stated that "no unconstitutional taking occurs where a state exercises its right to take custody and control of abandoned property." *Id.* at 774.

On March 9, 2005, plaintiff filed a Notice of Appeal of the Commonwealth Court decision in the Pennsylvania Supreme Court. In the Notice of Appeal, plaintiff stated that he did not seek review of the Commonwealth Court's holding that the DAUPA does not require payment of interest, the issue underlying this Court's decision to abstain and stay proceedings in this case. Plaintiff's appeal is still pending. Pl. Mot. Summ. J. at 4.

On June 8, 2005, this Court issued a Memorandum and Order granting defendant's Motion to Vacate Stay. *Smolow*, 2005 WL 1377849, at *4. In that opinion, the Court also denied defendant's Supplemental Motion to Dismiss, noting that "the question of whether plaintiff suffered a taking without just compensation as a result of defendant's failure to pay him interest required further factual development of the record" to determine whether plaintiff suffered a net loss. *Id.* For plaintiff to have suffered a taking, the amount of interest earned on plaintiff's property must

have exceeded the cost of returning interest to plaintiff. *See id.*

Cross-motions for summary judgment are currently before the Court. Plaintiff also filed a motion *in limine* to exclude portions of defendant's expert's report and testimony. The expert report and testimony is critical to the Court's determination of whether plaintiff suffered a net loss. "The parties have agreed to submit all merits-related issues to the Court for decision on cross-motions for summary judgment.... [T]he parties have [also] agreed that the Court may decide any genuine issues of material fact presented by the cross-motions for summary judgment on condition that the Court provide counsel with notice of any such issues, and give counsel and opportunity to supplement the record on such issues ...." Order of June 13, 2006 ¶ 6.

The Court deferred "[a]ll class-related proceedings including, but not limited to, the filing of a motion for class certification and class discovery ... until the Court rules on the cross-motions for summary judgment." *Id.* ¶ 7.

On March 5, 2007, late into the pretrial proceedings, plaintiff's counsel filed a second class action complaint, *Simon v. Wagner*, CA No. 07–880, which is nearly identical to the *Smolow* class action complaint. *Compare Smolow* Am. Complaint *with Simon* Complaint. The only difference between the *Smolow* and *Simon* complaints are the class representatives: Ronald J. Smolow is the class representative in *Smolow*, while Richard D. Simon and Vera Pomerantz are the class representatives in *Simon*. Notably, the class definitions are identical. *Compare Smolow* Complaint ¶ 24 with *Simon* Complaint ¶ 22.

## III. FACTS

### A. Introduction

Plaintiff, owner of 300 shares of common stock in Parker Drilling Company ("Parker"), alleges that Parker's agent mistakenly cancelled his stock and delivered it to the Treasury in August 2002. Am. Compl. ¶¶ 7–9. Defendant Hafer, as Treasurer of the Commonwealth, converted this stock into cash. *Id.* ¶ 9. On or about August 2003, "plaintiff learned that his Parker stock had come into" Treasury's possession. *Id.* ¶ 12. Plaintiff avers that defendant used the proceeds of the sale of his Parker stock and interest earned on it for public purposes. *Id.* ¶ 10. On or about January 5, 2004, defendant paid plaintiff the amount Treasury received from the stock sale, $586.47, but refused to pay plaintiff interest earned on the proceeds of the sale, estimated by plaintiff in his Amended Complaint to be approximately $30.00. *Id.* ¶¶ 12–16.

### B. Defendant's Expert Report

Defendant retained John S. Stoner to provide his opinion on whether plaintiff suffered a net loss, i.e., whether the accrued interest on plaintiff's property exceeded the cost to the Treasury of handling plaintiff's property and processing plaintiff's claim. Def. Opp. at 4. Mr. Stoner is a partner in an accounting firm, a Certified Public Accountant, a Certified Valuation Analyst, and has more than 23 years of experience in public accounting, which includes experience in forensic accountancy and business valuation. Stoner Rep. at 3; Ex. O to Stoner Rep. at 1.

In calculating Treasury's expense in handling plaintiff's claim, Mr. Stoner's analysis involved: (1) identifying each task performed in the handling of plaintiff's property; (2) identifying the Treasury employees that performed those tasks; (3) estimating the time each task took to complete; (4) determining the rate of compensation of each involved employee; and (5) identifying costs such as postage, printing, and servicing fees. Stoner Rep. at 6–7;

Def. Opp. at 5. To accomplish this, Stoner interviewed key personnel involved in the handling of property and claim processing at Treasury. Stoner Rep. at 6–7. Of the personnel interviewed by Stoner, five were directly involved in the handling of plaintiff's property and the processing of his claim. *Id.* at 6. At the conclusion of his analysis, Mr. Stoner found that, excluding servicing fees,[1] Treasury incurred direct expenses of $170.48 in handling plaintiff's claim.

In calculating the accrued interest on plaintiff's property, Mr. Stoner applied "Fund 98 daily factors," which is the method that Pennsylvania uses to allocate interest earnings from Fund 98 (the fund in which all unclaimed cash in invested) among the appropriate Commonwealth Funds. Stoner Rep. at 5. Stoner calculated $15.47 of earned interest relating to plaintiff's property. *Id.* In deposition, Mr. Stoner testified that the interest figure calculated by plaintiff's expert using monthly factors, $20.49, was also a reasonable figure, but that neither amount came close to exceeding Treasury's cost. Def. Opp. at 5. Using the $15.47 interest figure, Mr. Stoner calculated that Treasury's cost in handling plaintiff's property and processing plaintiff's claim exceeded interest earned on plaintiff's property by $155.01. Applying the $20.49 interest figure as calculated by plaintiff's expert, Mr. Stoner's methodology results in a conclusion that Treasury's cost of handling plaintiff's property and processing plaintiff's claim exceeded interest earned on plaintiff's property by $149.99. Hence, using either figure, Mr. Stoner concluded that plaintiff did not suffer a net loss. *See* Stoner Rep. at 1.

## C. Plaintiff's Expert Report

Plaintiff retained Wayne D. Geisser to provide an opinion on whether plaintiff suffered a net loss. Def. Opp. at 4. Mr. Geisser is a principal of an accounting firm, a Certified Public Accountant, a Certified Valuation Analyst, a Certified Fraud Examiner, has over 30 years of experience in accounting, and focuses his practice on forensic accounting. Geisser Rep. at 2.

In contrast to defendant's expert, Mr. Geisser estimated Treasury's cost of handling plaintiff's claim by examining the aggregate costs of Treasury's Bureau of Unclaimed Property ("Bureau" or "BUP"). To determine the cost of processing plaintiff's individual claim, Mr. Geisser applied two cost-allocation methodologies: (1) the number of properties under management ("number of properties approach"); and (2) the value of the properties under management ("value of properties approach"). *Id.* at 16. As to the number-of-properties approach, Mr. Geisser divided Bureau costs by the number of properties under management. *Id.* at Ex. K–1. This approach resulted in an allocation of $2.23 in costs to plaintiff's claim. *Id.* at 16. As to the value-of-properties approach, Mr. Geisser divided Bureau costs by the value of the funds under Bureau management, and then multiplied this figure by the value of plaintiff's claim. *See id.* at Ex. L–1. This approach resulted in an allocation of $5.84 in costs to plaintiff's claim. *Id.* at 16.

---

1. Mr. Stoner also concluded that $117.00 in servicing fees paid to Affiliated Computer Services, Inc. ("ACS") should be included in the cost of handling plaintiff's claim. Stoner Rep. at 5. Plaintiff disputes the amount of the fee and the propriety of including the fee in the cost of handing plaintiff's claim. Pl. Mot.

*In Limine* at 5; Pl. Mot. Summ. J. at 20–24. The Court does not address the ACS fee because it is immaterial: without inclusion of the ACS fee, the cost of handing plaintiff's claim still far exceeds plaintiff's accrued interest.

Mr. Geisser also considered, but ultimately rejected, a third methodology: determining the individual cost of processing plaintiff's claim by dividing total costs by the number of claims processed ("number-of-claims approach"). According to Mr. Geisser, the number-of-claims approach was "not appropriate because the focus is on only the claims processing component of BUP operations" when "BUP operations are also responsible for . . . all other functions carried out by" BUP. *Id.* at 17. Defendant points out that this approach yields an average cost per claim of approximately $399 in 2004. Def. Mot. Summ. J. at 26.

Mr. Geisser's methodology for calculating the accrued interest on plaintiff's property was similar to Mr. Stoner's approach, but Mr. Geisser used monthly interest factors instead of daily interest factors. Using this methodology, Mr. Geisser calculated $20.49 of earned interest relating to plaintiff's property. *Id.* Hence, Mr. Geisser determined that, depending on the cost-allocation methodology, plaintiff suffered a net loss of either $18.26 or $14.65.

## III. PLAINTIFF'S MOTION IN LIMINE

### A. Introduction

Plaintiff argues that portions of Mr. Stoner's expert report and testimony: (1) do not comport with *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and its progeny; and (2) should be precluded under Federal Rule of Civil Procedure 37(c). Specifically, plaintiff moves the Court to preclude the following portions of Mr. Stoner's expert report and testimony:

(1) Section 7a and Exhibit B—Interest Income Earned;

(2) Section 7c and Exhibits E and I—Direct Personnel Salary and Benefit Costs;

(3) Section 7d and Exhibits E and F—Direct Postage Costs;

(4) Section 7e and Exhibit G—Disbursement Processing Fee;

(5) Section 7f—Summary of Costs vs. Interest Earned on Smolow Property;

(6) Portions of Section 8a—Review and Critique of Plaintiff's Expert Report; and

(7) Section 8d—GASB 21—Accounting for Escheat Property.

Mot. *In Limine* at 1.

The Court concludes that: (1) Mr. Stoner's expert report and testimony satisfies the requirements of *Daubert*; and (2) precluding portions of Mr. Stoner's expert report and testimony under Federal Rule of Civil Procedure 37(c) is inappropriate. Thus, plaintiff's motion *in limine* is denied. Accordingly, the Court considers all of the Stoner Report and his testimony in ruling on the cross-motions for summary judgment.

### B. Discussion of *Daubert* Challenges

#### 1. Overview

Plaintiff's *Daubert* challenges focus upon Mr. Stoner's qualification as an expert and upon the reliability of Mr. Stoner's expert report. First, plaintiff argues that Mr. Stoner is not qualified to opine on the time that treasury personnel spent handling plaintiff's property and the direct costs associated with the handling of plaintiff's property. Second, plaintiff argues at length that Mr. Stoner's methodology and the underlying data upon which he relies are unreliable. The Court concludes that Mr. Stoner is qualified to opine on all topics included in his expert report and testimony and that Mr. Stoner's methodology and the underlying data are reliable. The Court rejects plaintiff's *Daubert* challenge for those reasons.

## 2. Legal Standard

■ Federal Rule of Evidence 702 governs the admissibility of expert testimony. The rule provides as follows:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

"Faced with a proffer of expert scientific testimony ... the trial judge must determine ... whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 592, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). This gatekeeping function extends beyond scientific testimony to testimony based on "technical" and "other specialized" knowledge. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

■ This Court must undertake a flexible inquiry to determine: (1) whether Mr. Stoner is a qualified expert in the area in which he is being offered as an expert; (2) whether Mr. Stoner's proposed testimony is reliable; and (3) whether Mr. Stoner's testimony will assist the trier of fact, in this case, the Court. *Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741–43 (3d Cir. 1994) (citing *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786). "These requirements are succinctly referred to as: qualifications, reliability, and fit." *Main St. Mortg., Inc. v. Main St. Bancorp., Inc.*, 158 F.Supp.2d 510, 512 (E.D.Pa.2001). The party offering the expert must prove each of these requirements by a preponderance of the evidence. *In Re TMI Litig.*, 193 F.3d 613, 663 (3d Cir.1999).

"Although the 'primary locus' of the District Court's gatekeeping role is Rule 702, a court 'should also be mindful of other applicable rules ... when conducting a *Daubert* analysis.'" *In re TMI Litigation*, 193 F.3d at 697 (citing *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786) (referring to, *inter alia*, Rule 703). Federal Rule of Evidence 703 is particularly instructive:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted.

Fed.R.Evid. 703.

### 3. Analysis

#### a. Mr. Stoner's Qualifications

Plaintiff challenges Mr. Stoner qualifications to opine on the amount of time spent by Treasury to process plaintiff's claim. Pl. Mot. *In Limine* at 13. According to plaintiff, "Stoner's general business valuation and accounting background do not qualify him" because he lacks experience or training in the area of governmental accounting. Pl. Mot. *In Limine* at 15. The Court rejects this argument.

"Although the standard for qualifying an expert witness is generally liberal, ... the standard has some limits". To qualify as an expert, "Rule 702 requires the witness to have 'specialized knowledge' regarding the area of testimony." *Betterbox Communications Ltd. v. BB Technologies, Inc.*, 300 F.3d 325, 334–35 (3d. Cir.2002) (citing *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d

Cir.1998) (noting that "at a minimum, a proffered expert witness ... must possess skill or knowledge greater than the average layman")).

█ Mr. Stoner is a CPA and CVA with more than twenty years of public accounting experience, serving both for-profit and non-profit entities. The Court concludes that Mr. Stoner has specialized knowledge in forensic accounting, which can be applied in a variety of contexts, including the examination of a government agency. An expert who focuses his practice on government agencies would be ideal in this case, but "it is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate."[2] *Holbrook v. Lykes Bros. S.S. Co., Inc.*, 80 F.3d 777, 782 (3d Cir.1996). "If the expert meets liberal minimum qualifications, then the level of the expert's expertise goes to credibility and weight, not admissibility." *Kannankeril v. Terminix Intern., Inc.* 128 F.3d 802, 809 (3d Cir. 1997).

### b. Reliability of Mr. Stoner's Methodology and the Underlying Data

Plaintiff argues that Mr. Stoner's methodology and the underlying data are unreliable because Mr. Stoner: (1) interviewed only a fraction of the Treasury personnel involved in processing plaintiff's claim, and did so long after the processing of plaintiff's claim; (2) did not review any contem-

poraneously-maintained time records; (3) arbitrarily modified time estimates of Treasury personnel; (4) did not calculate margin of error; (5) did not test his methodology against other properties; and (6) did not perform "breakeven" analysis. Pl. Mot. *In Limine* at 18–19. As to each argument, plaintiff does not distinguish whether he is challenging Mr. Stoner's methodology, the underlying data, or both. Accordingly, the Court considers both Rule 702 and Rule 703 where appropriate.[3]

█ To satisfy the reliability requirement, "the expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." *Paoli*, 35 F.3d at 742. In determining whether the reliability requirement is met, courts examine the following factors where appropriate:

(1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

---

**2.** The Court notes that plaintiff's expert does not focus his practice on government agencies either. Mr. Geisser has not been retained to review the books and records of any governmental agencies, other than in the instant case, since 1991. Geisser Dep., Ex. 4 to Def. Mot. *In Limine* at 12.

**3.** The Third Circuit has recognized that determining "whether expert testimony depends

on a reliable scientific technique, to be analyzed under Rule 702, or whether the basis for testimony is facts or data ... of a type reasonably relied upon by experts in the particular field, to be analyzed under Rule 703 ... is often times subtle if not strained." *Paoli*, 916 F.2d at 856 (internal citations omitted); *see also In re TMI Litigation*, 193 F.3d at 697 (incorporating both Rule 702 and Rule 703 in its gatekeeping analysis).

*Id.* These factors are neither exhaustive nor applicable in every case. *Kannankeril v. Terminix Intern., Inc.,* 128 F.3d 802 (3d Cir.1997).

### i. Interview Methodology

Plaintiff argues that Mr. Stoner's time estimates are unreliable because Mr. Stoner met with only five of the twenty individuals that he identified as directly involved in the handling of plaintiff's property and claim, and thus, his opinion is based largely on hearsay. Pl. Mot. *In Limine* at 17, 19. Additionally, plaintiff argues that Mr. Stoner's interview methodology is unreliable because the interviews occurred approximately three years after the processing of plaintiff's property. *Id.* at 17. The Court rejects these arguments.

"Rule 703 permits experts to rely on hearsay so long as that hearsay is of the kind normally employed by experts in the field." *In re TMI Litigation,* 193 F.3d at 697. Plaintiff's own expert stated in deposition that it is an appropriate practice for forensic accountants to gather facts from "[w]hatever source is available.... You can gather facts from interviewing people." Geisser Dep., Ex. 4 to Def. Mot. *In Limine* at 14. Furthermore, it is clear that interviews with agency or "company personnel" are "normally and reasonably relied upon by accountants" under Rule 703. *International Adhesive Coating Co., Inc. v. Bolton Emerson Intern., Inc.,* 851 F.2d 540, 545 (1st Cir.1988); *see also In re Sulfuric Acid Antitrust Litigation,* 235 F.R.D. 646, 656 (N.D.Ill.2006) (noting that interviews, even if not highly focused and systematic, "can be a reliable source of data upon which to base expert opinion").

█ The Court concludes that it was not necessary for Mr. Stoner to interview every individual involved in the handling of plaintiff's property and claim in order to establish that his methodology is reliable. As Mr. Stoner explains in his expert report, he met with the key Treasury personnel:

> I worked directly with [the Bureau] Division Manager of Quality Control to identify the specific tasks relating to Mr. Smolow's claim processing. I then interviewed five managers within the [Bureau] who were directly involved in the specific processing steps identified. Documentation supporting the tasks identified was also reviewed.... I have identified, with assistance of [Bureau] personnel, 40 separate tasks which occurred within the [Bureau] relating to the Smolow property.... I then interviewed key personnel involved with the property handling and claim processing. The focus of these interviews was to quantify the [Bureau] staff time directly involved in handling the Smolow property and claim.

Ex. 2 to Def. Opp. at 6–7.

Furthermore, plaintiff offers no authority for the proposition that Mr. Stoner's interviews are unreliable because they did not occur immediately after the processing of plaintiff's claim. Indeed, expert discovery almost always takes place several years after a cause of action arises. *See, e.g., Mextel, Inc. v. Air–Shields, Inc.,* 2005 WL 226112, *10 (E.D.Pa. Jan.31, 2005) (expert discovery concluding in 2003 for events occurring in 1996 through 1999).

The Court concludes that, under Rule 702, Mr. Stoner's interview methodology is reliable, and under Rule 703, the interviews were of a type reasonably relied upon by forensic accountants.

### ii. Time Records

Plaintiff argues that Mr. Stoner's opinion is unreliable because he did not review any time records that were contemporaneously maintained by Treasury personnel. Pl. Mot. *In Limine* at 18. The Court rejects this argument. As plaintiff con-

cedes, "Stoner did not review any actual time records contemporaneously maintained by any [Bureau] employee because no such records were kept and [the Bureau] does not track time spent on the handling of individual property." *Id.* at 19. Indeed, Treasury's lack of time records is precisely the reason that Treasury needed to retain Mr. Stoner to conduct interviews. Hence, whether Mr. Stoner's opinion is reliable depends not upon whether he examined time records, but upon whether his interview methodology is reliable.

### iii. Modification of Time Estimates

Plaintiff argues that Mr. Stoner's methodology is unreliable because he subjectively and arbitrarily modified the time estimates given to him by Treasury personnel. Pl. Mot. *In Limine* at 20–22. The Court rejects this argument.

Plaintiff's most "striking example" of Mr. Stoner's modifications involved the liquidation of plaintiff's 300 shares of Parker stock. Pl. Mot. *In Limine* at 20. Bureau personnel provided Mr. Stoner with an initial estimate of two hours for the task, and Mr. Stoner reduced that time to one hour after further interviews.[4] Stoner Dep., Ex. N to Pl. Mot. *In Limine* at 65–72. As to this example, Mr. Stoner explained in deposition that, in his judgment, he did not believe that it actually took two hours to conduct the liquidation and to coordinate the liquidation with internal records. Pl. Mot. *In Limine* at 21.

> Based on my conversations with [Treasury personnel,] it was my understanding that the 60 minutes was a realistic allocation of that activity to the Smolow property.... The people that I'm interviewing are people who manage these functions on a day in and day out basis.

They understanding the activities and the work involved in it.

Stoner Dep., Ex. N to Pl. Mot. *In Limine* at 70–71. As to other time modifications, Mr. Stoner explained:

> In my interview process, I reviewed and tried to discern whether they are talking about time handling a group of properties or one specifically and there were some instances where there was a group of properties being handled ... with a particular activity and I allocated that total amount of time specifically to the Mr. Smolow property using ... in most case just a proportionate pro rata allocation.

Stoner Dep., Ex. 3 to Def. Opp. at 28. Accordingly, the Court determines that Mr. Stoner did not arbitrarily or subjectively modify time estimates, but rather modified them based on detailed interviews with Treasury personnel. Thus, the Court concludes that Mr. Stoner's modifications do not render his methodology unreliable.

### iv. Margin of Error

Plaintiff argues that Mr. Stoner's methodology is unreliable because there is no way to calculate the margin of error associated with Mr. Stoner's timeline. The Court rejects this argument.

Mr. Stoner's task was to determine whether plaintiff suffered a net loss, not to pinpoint the exact cost of handling plaintiff's property and processing plaintiff's claim. *See Smolow*, 2005 WL 1377849, at *4. "The *Daubert* factors, especially the peer review and *known rate of error factors*, are not always entirely applicable to non-scientific expert testimony." *Neely v. Miller Brewing Co.*, 246 F.Supp.2d 866, 872 (S.D.Ohio 2003) (emphasis added) (cit-

---

4. The Court notes that Mr. Stoner decreased the time estimate, hence lowering his total cost estimate.

ing *Kumho Tire Co. v. Carmichael*, 526 U.S. at 149–52, 119 S.Ct. 1167);) *see also Kannankeril v. Terminix Intern., Inc.*, 128 F.3d 802 (3d Cir.1997) (noting that some of the *Daubert* factors may not always be applicable); *Thomas v. City of Chattanooga*, 398 F.3d 426, 431 n. 1 (6th Cir.2005) (noting that "it may not make sense to apply some of the *Daubert* factors, such as the *rate of error analysis,* to non-scientific testimony") (emphasis added)). In this case, where Mr. Stoner concluded that Treasury's costs far exceeded the cost of handling plaintiff's property and processing plaintiff's claim, the rate of error factor is not crucial to the Court's determination of whether Mr. Stoner's opinion is reliable. *See In re TMI Litigation Cases Consolidated II,* 911 F.Supp. 775, 812–813 (M.D.Pa.1996), *aff'd,* 193 F.3d 613, 623 (3d Cir.1999) (noting that, "due to the inherently non-precise nature of this methodology, [the rate of error] factor will neither be weighed in favor of [nor against] the admission of the proffered testimony").

Furthermore, the Court notes that, while there is no ascertainable rate of error associated with Mr. Stoner's methodology, another forensic accountant could repeat Mr. Stoner's interview methodology to ascertain its accuracy. *See Montgomery v. Mitsubishi Motors Corp.,* 2006 WL 1967361, \*6 (E.D.Pa. June 6, 2006) (noting that, even though the expert was "not particularly explicit as to her precise methodology," another expert could repeat the "calculations to ascertain their accuracy").[5]

#### v. Testing of Methodology

Plaintiff argues that Mr. Stoner's methodology is unreliable because he "made no attempt to test his methodology by applying it to other unclaimed properties or other scenarios to verify its accuracy and reliability."[6] Pl. Mot. *In Limine* at 18. The Court rejects this argument.

According to plaintiff, Mr. Stoner's "report is extremely narrow in focus and offers no support for the assertion that a taking without just compensation does not occur with respect to other property owners." *Id.* Mr. Stoner did not deny "that there could be a ... property within the system [at Treasury] and is generating an interest income that could exceed the expense." Stoner Dep. at 60. This has no bearing, however, on whether Mr. Stoner's opinion regarding plaintiff's property is reliable. As defendant accurately notes,

> The issue before the Court at this stage ... is whether Smolow has a viable claim—i.e., whether the interest claimed by Smolow was exceeded by the costs to Treasury to process his claim. If Smolow did not have a "net loss," he may not maintain this action.... Whether, theoretically, somebody else might have had a net loss is not presently before this Court.

Def. Opp. at 16–17. Accordingly, the Court rejects this argument.

---

**5.** Plaintiff notes that Mr. Stoner's stated in testimony that "forty (40) different people performing the same analysis would likely come up with (40) different results." Pl. Mot. *In Limine* at 18. Plaintiff takes Mr. Stoner's testimony out of context. Mr. Stoner explained that his calculation of the cost of plaintiff's claim was an estimate, such that no two experts would arrive at an identical time calculation. *See* Stoner Dep., Ex. 3 to Def. Opp. at 71–72. The purpose of this deposition testimony was merely to point out that

most experts using an interview methodology would arrive at a cost estimate that far exceeds Mr. Geisser's cost estimates. *See id.*

**6.** To the extent that plaintiff is arguing that Mr. Stoner's methodology does not consist of a testable hypothesis, the Court again notes that another forensic accountant could repeat Mr. Stoner's interview methodology to ascertain its accuracy. *See Montgomery,* 2006 WL 1967361 at \*6.

#### vi. Breakeven analysis

Plaintiff argues that Mr. Stoner's methodology is unreliable because he did not perform break-even analysis. Pl. Mot. *In Limine* at 18. The Court rejects this argument.

In this case, three factors control the amount of interest income that an unclaimed property generates: (1) the original value of the property; (2) the interest rate (and the manner in which interest is compounded); and (3) the amount of time that the property has accumulated interest. The breakeven point is the point in time at which the amount of interest generated by the unclaimed property equals the costs associated with handling that property. *See* Stoner Dep. at 18. In calculating the breakeven point, the original value of the property, the interest rate, and the costs associated with handling the property are all held constant. Alternatively, holding constant the length of time, the original value of the property, and the costs associated with handling the property, one could calculate the breakeven interest rate.[7] The fact that Mr. Stoner did not employ breakeven analysis does not affect the reliability of his opinion in any way. In this case, breakeven analysis would simply reveal how many additional years—or, alternatively, what interest rate—would be required for plaintiff's property to accumulate sufficient interest to offset the cost of handling plaintiff's property and processing plaintiff's claim.

#### C. Discussion of Factual Support/Federal Rule of Civil Procedure 37(c)

#### 1. Overview

Plaintiff argues that portions of Mr. Stoner's expert report and testimony: (1)

should be precluded because it contradicts defendant's interrogatory answers and stipulations; and (2) should be precluded under Federal Rule of Civil Procedure 37(c) because it is predicated on facts not supported by the record and not produced in discovery. Pl. Mot. *In Limine* at 23–25. The Court concludes: (1) that Mr. Stoner's opinion does not contradict defendant's interrogatory answers and stipulations; and (2) preclusion under Federal Rule of Civil Procedure 37(c) is inappropriate.

#### 2. Legal Standard

"The imposition of sanctions for abuse of discovery under Fed.R.Civ.Pro. 37 is a matter within the discretion of the trial court." *Newman v. GHS Osteopathic, Inc., Parkview Hosp. Div.,* 60 F.3d 153, 156 (3d. Cir.1995) (citing *Orjias v. Stevenson,* 31 F.3d 995, 1005 (10th Cir.)). Federal Rule of Civil Procedure 37(c) (1) provides as follows:

> If a party fails to make a disclosure required by Rule 26(a), any other party may move to compel disclosure and for appropriate sanctions. The motion must include a certification that the movant has in good faith conferred or attempted to confer with the party not making the disclosure in an effort to secure the disclosure without court action.

Fed.R.Civ.P. 37(c)(1). As the Third Circuit explained in *Capital Funding v. Chase Manhattan Bank USA,* 191 Fed.Appx. 92, 96 (3d Cir.2006), Rule 37(c)(1) "prohibits using evidence at trial that has not been disclosed pursuant to Fed.R.Civ.P. 26, unless the failure to disclose is harmless. However, the exclusion of critical evidence is an 'extreme' sanction, not normally ... imposed absent a showing of willful deception or 'flagrant disregard' of a court order

---

7. The Court notes that any of these variable can readily be calculated by holding the other figures constant.

by the proponent of the evidence." *Id.* (internal quotations omitted.) Indeed, Rule 37 "expressly provides that sanctions should not be imposed if substantial justification exists for the failure to disclose, or if the failure to disclose was harmless." *Newman,* 60 F.3d at 156.

### 3. Analysis

#### a. Defendant's Interrogatory Answers and the Parties' Stipulations

Plaintiff argues that defendant's stipulations and interrogatory responses contradict Mr. Stoner's opinion as to both the cost of handling plaintiff's property and processing his claim, and the interest earned on plaintiff's property. Pl. Mot. *In Limine* at 1–3; 5–9. The Court rejects this argument.

As to the cost of processing plaintiff's claim, the parties stipulated that "Treasury does not keep track of or allocate the costs associated with processing any particular individual claim". *Id.* at 7. Further, in response to plaintiff's interrogatories, defendant stated, *inter alia,* that "the time Treasury personnel spent to process Mr. Smolow's claim cannot be calculated because the times spent by personnel on any given claim is not something that is recorded." *Id.* at 6. Defendant concedes that Treasury could not calculate the time that personnel spent to process plaintiff's claim. Pl. Opp at 10.

■ Defendant's stipulations and interrogatory responses pertain only to whether Treasury could have itself calculated the time spent to process plaintiff's claims on the basis of time records and records of direct costs; the interrogatory responses do not pertain to whether Treasury could retain an outside expert to reliably estimate the cost of processing plaintiff's claim. The context in which defendant couched its interrogatory responses makes this readily apparent: "The three primary functions of the Treasury Department's Bureau of Unclaimed Property are to collect unclaimed and abandoned property, to hold that property until it can ... be returned ... and to return property to the rightful owners. *The Bureau's budget is not, however, broken down into components.*" Pl. Mot. *In Limine* at 8 (emphasis added). On this record, the Court concludes that Mr. Stoner's cost estimates do not contradict any interrogatory response or stipulation between the parties.

As to the interest earned on plaintiff's property, plaintiff argues that Mr. Stoner's reliance on daily interest factors contradicts the parties' stipulations regarding monthly interest factors. The only difference between the experts' interest calculation is that Mr. Stoner applied daily interest factors and Mr. Geisser applied monthly interest factors Mr. Stoner's application of daily interest factors resulted in an interest calculation of $15 .47, while Mr. Geisser's application of monthly interest factors resulted in an interest calculation of $20.49. The difference in the calculation, $5.02, does not affect Mr. Stoner's expert opinion that Treasury's direct expenses in handling plaintiff's claim, $170.48, far exceeded interest accrued on plaintiff's property. In fact, Mr. Stoner testified in deposition that the interest figure calculated by Mr. Geisser using monthly factors was also a reasonable figure. Def. Opp. at 5.

Moreover, in defendant's motion for summary judgment, defendant stated that, "for purposes of the cross-motions for summary judgment, Treasury will use Smolow's figure of $20.49" because "whether interest earned is $15.47 or $20.49 has no impact on the outcome of the net [loss] issue." Def. Mot. Summ. J. at 24. Because the discrepancy between Mr. Stoner's and Mr. Geisser's interest calculation is immaterial, the Court need not

reach the issue of whether it is appropriate to preclude evidence that plaintiff's property only accumulated $15.47 in interest.[8]

### b. Facts in the Record and Produced in Discovery

■ Regarding both the cost of processing plaintiff's claim and the interest accrued on plaintiff's property, plaintiff argues that Mr. Stoner's opinion should be precluded under Federal Rule of Civil Procedure 37(c)(1) because it is predicated on facts not supported by the record or produced in discovery. Pl. Mot. *In Limine* at 23–26. The Court disagrees.

As to both the time costs and direct costs of processing plaintiff's claim, Mr. Stoner's opinion has a factual basis: documents that show the rate of compensation for Treasury employees, and his interviews with key Treasury employees. Plaintiff argues that

the alleged postage charges and personnel costs were not disclosed, either in Defendant's initial response to Interrogatory No. 11, or thereafter by way of amendment or supplemental interrogatory response. To the contrary, Defendant asserted that it had not calculated such costs and could not calculate such costs because they were not tracked.

Pl. Mot. *In Limine* at 25. As the Court previously explained, defendant's interrogatory responses pertain only to whether Treasury could have itself calculated costs, and not to whether Treasury could retain

an outside expert to estimate the cost of processing plaintiff's claim. Moreover, as defendant points out

Mr. Stoner was retained by Treasury after the close of discovery. At the time of his retention, Treasury had no concept of what Mr. Stoner's approach would be and, until he sought information regarding compensation of various employees did not know such documentation would be used.

Def. Opp. at 20. If, after Mr. Stoner's report was produced, plaintiff concluded that he needed additional discovery of such things as postage charges and personnel costs, leave of Court should have been requested to pursue such discovery.

With respect to the interest accrued on plaintiff's property, Mr. Stoner's opinion is based on daily interest factors, which defendant did not produce in discovery. As defendant explains, Mr. Stoner

"sought to determine whether a more precise determination of interest could be made and, once he learned daily interest factors could be obtained, he based his calculations on them.... This was after the close of discovery and long after Smolow was provided [the monthly interest factors]. Treasury could not, prior to the close of discovery, have known that an expert it had not even hired would want the information."

Def. Opp. at 24. As with the postage charges and personnel costs, plaintiff could

---

8. The Court notes that it is far from clear that the parties stipulated that applying monthly interest factors was appropriate in this case. Plaintiff's interrogatories state the following: *For each month* from 1998 to the present, state the rate of interest made on case proceeds from the liquidation, sale or otherwise from unclaimed property that is deposited ... by Treasury .... [S]tate the rate of interest paid on the money held in the General Fund *for each month* from 1998 to present.

Ex. 10 to Def. Opp. (emphasis added). In response, defendant stipulated to the relevant monthly interest factors, from 1998 to the present. Stipulations, Ex. 1 to Def. Opp at 11. In contrast, defendant never stipulated that applying monthly interest factors, as opposed to daily interest factors, was appropriate in this case. *See id.* This determination is a question of law, whereas the determination of the actual daily or monthly interest rates is a question of fact.

have sought leave of Court to obtain discovery of the daily interest factors after receiving the Stoner Report.

Moreover, the non-disclosure of daily interest factors was harmless because, as previously explained, the difference between applying monthly and daily interest factors is immaterial to Mr. Stoner's conclusion that plaintiff did not suffer a net loss. Indeed, the Court considers only the $20.49 interest figure provided by plaintiff's expert in ruling on the motions for summary judgment.

Plaintiff asked the Court to sanction defendant under Federal Rule of Civil Procedure 37 for the aforesaid claimed discovery abuses by excluding all evidence of postage charges, personnel costs, and daily interest factors. The Court finds no conduct on defendant's part that warrants imposition of any sanctions under Rule 37.

## IV. CROSS–MOTIONS FOR SUMMARY JUDGMENT

### A. Introduction

Plaintiff requests the Court to declare the relevant provisions of DAUPA unconstitutional and enjoin the defendant from continuing to enforce DAUPA without paying interest. Plaintiff also seeks attorneys' fees. *Smolow v. Hafer*, 353 F.Supp.2d 561, 565 (E.D.Pa.2005).

Plaintiff moves for summary judgment on the basis that: (1) there is no genuine issue as to the fact that plaintiff suffered a net loss; and (2) the Just Compensation and Due Process Clauses of the United States Constitution require the payment of interest upon Treasury's return of plaintiff's property. Defendant moves for summary judgment on the basis that: (1) there is no genuine issue as to the fact that plaintiff suffered no net loss; and (2) even if plaintiff did suffer a net loss, the Just Compensation and Due Process Clauses of the United States Constitution do not re-

quire the payment of interest upon Treasury's return of plaintiff's property.

The Court concludes that there is no genuine issue as to the fact that plaintiff suffered no net loss. Based on that determination, plaintiff's motion for summary judgment is denied and defendant's motion for summary judgment is granted as to plaintiff Smolow. The Court need not and does not reach the issue of whether a taking would have occurred had plaintiff suffered a net loss.

### B. Standard of Review

A court should grant summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A "genuine" issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is "material" when it "might affect the outcome of the suit under the governing law." *Id.* In considering a motion for summary judgment, "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The party opposing the motion, however, cannot rely merely upon bare assertions, conclusory allegations, or suspicions to support its claim. *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir.1982).

## C. Discussion

### 1. Overview

For a taking to have occurred in this case, plaintiff must have sustained a net loss. Defendant's expert concluded that plaintiff did not sustain a net loss, while plaintiff's expert concluded that plaintiff did suffer a net loss. The Court accepts defendant's expert report and testimony, which it has already found to be reliable, and determines that plaintiff did not suffer a taking without just compensation. The Court rejects plaintiff's expert report and testimony, which is flawed and does not fit the facts of this case.

### 2. Legal Standard

In *Smolow v. Hafer*, 2005 WL 1377849, at *3–4, this Court ruled that plaintiff must have suffered a net loss—the amount of interest earned must exceed the cost of handling plaintiff's property and processing plaintiff's claim—in order for a taking without just compensation to have occurred. *Id.* at *3 (citing *Brown v. Legal Foundation of Washington*, 538 U.S. 216, 123 S.Ct. 1406, 155 L.Ed.2d 376 (2003)).[9] At that stage of the proceeding, the Court held that "the question of whether plaintiff suffered a taking without just compensation as a result of defendant's failure to pay him interest requires further development of the record." *Id.* at *4. The Court did not reach the question of whether a taking would have occurred if plaintiff indeed suffered a net loss.[10] *See id.*

### 3. Analysis

### a. Plaintiff Did Not Sustain a Net Loss

■ Defendant's expert concluded that the cost of handling plaintiff's claim was approximately $170.48,[11] while the interest on plaintiff's property was $15.47. He conceded, however, that an interest calculation based on monthly interest factors, yielding $20.49 in accumulated interest, would also be appropriate. Additionally, defendants stated that "for purposes of the cross-motions for summary judgment,

---

9. In *Brown*, petitioners challenged a state law requiring lawyers to deposit their clients' funds into "interest on lawyer's trust accounts" (IOLTAs) and directing the banks holding these funds to transfer interest earned on the funds to a state legal foundation. Petitioners argued that this law violated the Takings and Just Compensation Clauses of the U.S. Constitution. In its opinion, the *Brown* court stated that "the interest earned in the IOLTA accounts 'is the private property of the owner of the principal.'" *Id.* at 235, 123 S.Ct. 1406 (quoting *Phillips v. Washington Legal Foundation*, 524 U.S. 156, 172, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998)). However, the Court went on to rule that transferring this interest to different owners for public use did not constitute a taking without just compensation where petitioners did not suffer a "net loss" as a result. *Id.* at 240, 123 S.Ct. 1406.

10. Plaintiff incorrectly interpreted this Court's June 8, 2005 Memorandum and Order (*Smolow v. Hafer*, 2005 WL 1377849, at *3–4) "as rejecting Defendant's argument that Plaintiff's property was 'abandoned' in the common law sense, and, thus rejecting the argument that there can be no taking when the State retains the interest but returns the principal." Pl. Opp to Def. Mot. Sum. J. at 6. The Court has not yet decided this issue, and does not reach this issue in this opinion. Accordingly, the "law of the case doctrine" is inapplicable. *See In re Continental Airlines, Inc.*, 279 F.3d 226, 232 (3d Cir.2002) ("The law of the case doctrine 'limits relitigation of an issue once it has been decided' in an earlier stage of the same litigation.") (citing *Hamilton v. Leavy*, 322 F.3d 776, 786–787 (3d Cir.2003)).

11. As the Court has already noted, Mr. Stoner also concluded that $117 in servicing fees paid to ACS should be included in the costs of handling plaintiff's claim. Stoner Rep. at 5. The Court does not address the ACS fee because it is immaterial: without inclusion of the ACS fee, the cost of handing plaintiff's claim still far exceeds plaintiff's accrued interest. *See supra* note 1.

Treasury will use Smolow's interest figure of $20.49." Def. Mot. Summ. J. at 24. The Court has already scrutinized defendant's expert report and testimony at length, and has concluded that it is reliable. Accordingly, viewing the facts in the light most favorable to plaintiff, Treasury's cost in handling plaintiff's property and processing plaintiff's claim exceeded interest earned on plaintiff's property by approximately $149.99 ($170.48 minus $20.49). There is no genuine issue as to the fact that plaintiff suffered no net loss. The Court concludes that plaintiff did not sustain a net loss and thus did not suffer a taking without just compensation.

### b. Plaintiff's Expert Report

The Court further explains why plaintiff's expert report and testimony does not raise any genuine issue of material fact in this case. Plaintiff points out that overall interest earned on unclaimed property exceeds total costs to operate BUP. Pl. Mot. Summ. J. at 12. For example, in 2005, unclaimed properties generated $63.6 million in interest, while the costs of operating BUP were only $15.5 million. The Court refers to the amount by which interest exceeds operating costs as "net income." For 2005, net income equaled $48.1 million ($63.6 million minus $15.5 million).

According to plaintiff, this "leads to the inescapable conclusion that, overall, property owners who have submitted a claim and not been paid interest in the fiscal years for which data was produced have, in fact, suffered a net loss ...." *Id.* at 13. The Court disagrees. The fact that interest exceeds the costs of operating the BUP reveals only that at least some unclaimed property owners have suffered a loss, not that plaintiff suffered a net loss. The

Court notes that defendant's expert does not deny that "there could be property within the system that is sitting there and is generating an interest income that could exceed expense." Stoner Dep at 29.

In this case, plaintiff's claim is quite small. Treasury's gross proceeds on the sale of plaintiff's stock was only $603. Def. Mot. Summ. J. at 19; Am. Compl. ¶ 9. Moreover, the property accumulated interest for the short period between August 2002 and January 5, 2004. *Id.* ¶¶ 9, 14. Viewing the facts in the light most favorable to plaintiff, plaintiff's property generated only $20.49 of interest in this period. The cost of handling plaintiff's property and processing his claim—$170.48—far exceeds such interest.

In contrast, as plaintiff concedes, there are large inactive [12] properties in the Treasury system that have been accumulating interest for many years. For example, Claim ID# 99130828, an inactive property with a value of $40,916, has been accumulating interest since 1996. Pl. Mot. Summ J. at 17. According to plaintiff's expert, the property has generated $1,429.61 in interest thus far. *Id.* at 18. Large inactive properties, such as Claim ID# 99130828, generate a great deal of interest, but cost little to maintain. Inactive properties generate only up-front costs reflecting the "process by which property is identified, property is received, [and] property is processed ...." Geisser Dep. at 44. On this issue, plaintiff's expert conceded as follows in deposition:

> Q. When a property [enters the system] in 1990 and a claim has not been submitted for that property, what management activities take

12. The Court uses the term "inactive" properties to denote properties that have not been claimed.

place in 2006 with respect to that property?

\* \* \* \* \* \*

A. The hypothetical that you're describing is probably just maintained in the system at that point in time .... I would think, if it's just maintained in the system there is relatively little, because is just exists as a piece of property in the system. *Id.* at 45. Significantly, inactive properties do not generate any claim-processing costs (costs incurred when "claims are made, claims are processed, [and] checks are written"). *Id.* at 44.

■ In the context of this case, the aggregate approach [13] taken by plaintiff's expert, Mr. Geisser, is flawed because it does not account for large inactive properties that generate significant interest but cost little to maintain. Plaintiff recognizes that "the percentage of claims paid vs. the number of properties under management for [fiscal year 2000 to fiscal year 2005] range from" .29% to .71%. Pl. Opp. to Def. Mot. Summ. J. at 23 n. 13 (citing Geisser Rep. at 17–18.) In other words, in any given year, over 99% of the properties held by Treasury remain unclaimed, generating little or no maintenance cost but accumulating large amounts of interest income. Additionally, the "percentage of claims paid vs. the dollar value of properties under management ranges from" 2.36% to 4.22%. *Id.* In other words, in any given year, over 95% of property value remains unclaimed; such property generates little to no maintenance cost but accumulates large amounts of interest income. Accord-

ingly, the Court rejects Mr. Geisser's methodology.

The Court notes that Mr. Geisser considered, but ultimately rejected, a different methodology: determining the individual cost of processing plaintiff's claim by dividing total costs by the number of claims processed. Defendant points out that this approach yields an average cost per claim of approximately $399 for 2004. Def. Mot. Summ. J. at 26. According to Geisser, this approach was "not appropriate because the focus is on only the claims processing component of BUP operations" when "BUP operations are also responsible for ... all other functions carried out by" BUP. *Id.* at 17. Despite rejecting the number-of-claims approach, Mr. Geisser utilized the number-of-properties approach and the value-of-properties approach, both of which had equally glaring faults. In fact, all three methodologies have substantial flaws in the context of this case; the only distinction is that the number-of-claims approach does not result in a favorable cost figure for the plaintiff.

Plaintiff cites to an unpublished opinion from the Court of Common Pleas of Franklin County, Ohio to support the contention that "it would be entirely proper for this Court to compare costs and interest in the aggregate in determining whether DAUPA violates the Takings Clause of the U.S. Constitution." Pl. Opp. to Def. Mot. Summ. J. at 26. That court stated as follows:

Since fiscal year 1992, over $1 billion dollars in unclaimed funds have been

---

**13.** To determine the cost of processing plaintiff's individual claim, Mr. Geisser applied two cost-allocation methodologies: a number of properties approach and a value of the properties approach Geisser Rep. at 16. As to the number-of-properties approach, Mr. Geisser divided Bureau costs by the number of properties under management. *Id.* at Ex. K–1. This approach resulted in a cost alloca-

tion of $2.23 to plaintiff's claim. *Id.* at 16. As to the value-of-properties approach, Mr. Geisser divided Bureau costs by the total value of the property under Bureau management, and then multiplied this figure by the dollar value of plaintiff's property. *See id.* at Ex. L–1. This approach resulted in a cost allocation of $5.84 to plaintiff's claim. *Id.* at 16.

reported to or deposited with the Division, but over that recent period only $381 million (or 36%) have been paid out. Stip. Two ¶ 23. Viewed more broadly, beyond a reasonable doubt the unclaimed funds program generates millions of dollars in net interest each year that is simply expropriated by the state. Restitution is therefore due the class of property owners represented by Mr. Sogg based upon the value of the interest earned on each individual account retained by the Division. *See Brown, supra*, at 239, fn. 10, 123 S.Ct. 1406. *Sogg v. White*, C.A. No. 04–CVG–08–8028 (Ct. Comm. Pleas, Franklin County, Ohio).

The *Sogg* opinion does not affect the Court's analysis. First, the Court notes that the passage in *Brown* to which *Sogg* cites does not support the contention that an aggregate approach is appropriate. Quite to the contrary, the *Brown* passage states that payment of interest would be inappropriate "if it is necessary to incur substantial legal and accounting fees to determine how many pennies of interest were earned while petitioners' funds remained in escrow and how much of that interest belonged to them ...."[14] *Brown,* 538 U.S. 216, 238 n. 10, 123 S.Ct. 1406, 155 L.Ed.2d 376 (2003). Second, it is unclear from *Sogg* whether that court had before it evidence showing that the cost of processing Sogg's claim far exceeded the interest accumulated on Sogg's property. Finally, if the *Sogg* court had such evidence, this Court disagrees with the decision to ignore the evidence in favor of aggregate figures.

Accordingly, the Court concludes that there is no genuine issue as to the fact that the plaintiff in this case suffered no net loss. Thus, plaintiff did not suffer a taking without just compensation. The Court does not address the question whether a taking would have occurred had a member of the putative class suffered a net loss. Accordingly, the Court grants defendant's motion for summary judgment against plaintiff Smolow.

## V. EFFECT OF SUMMARY JUDGMENT AGAINST PLAINTIFF SMOLOW

Granting defendant's motion for summary judgment against plaintiff Smolow does not necessarily terminate plaintiff's class action. *See In re Cigna Corp. Securities Litigation,* 459 F.Supp.2d 338, 356 (E.D.Pa.2006) (noting that, "granting Defendants' motion for summary judgment ... would do nothing to advance the termination of this litigation"). As explained in *In re Cigna Corp. Securities Litigation,* 2005 WL 3952802, *2 (E.D.Pa. Apr.26, 2005),

> if defendants are successful in their summary judgment motion against SERS, such a result should not cause termination of the entire case if other putative class members are willing, able and ready to step forward as class representatives and also as Lead Plaintiffs

---

**14.** As Justice Stevens more fully explained,

> The first hypothetical ... illustrates the fundamental flaw in Justice Scalia's approach to this case. Under his view that just compensation should be measured by the gross amount of the interest taken by the State, the client should recover the $.55 of interest earned on a 2–day deposit even when the transaction costs amount to $2.00. Thus, in this case, under Justice Scalia approach, even if it is necessary to incur substantial legal and accounting fees to determine how many pennies of interest were earned while petitioners' funds remained in escrow and how much of that interest belonged to them rather than to the sellers, the Constitution would require that they be paid the gross amount of that interest, rather than an amount equal to their net loss (which, of course, is zero). As explained above, this is inconsistent with the Court's just compensation precedents.

*Brown,* 538 U.S. 216, 238, 123 S.Ct. 1406 (2003).

and can prove loss causation and/or economic loss.

Similarly, in this case, the Court's granting of defendant's motion for summary judgment will not terminate the entire case if other members of the putative class can establish that they suffered a net loss and are qualified and willing to become class representatives.

On March 5, 2007, late into the *Smolow* pretrial proceedings, plaintiff's counsel filed a second class action complaint, *Simon v. Wagner*, CA No. 07–880, which is nearly identical to the Smolow class action complaint. *Compare Smolow* Am. Complaint *with Simon* Complaint. The only difference between the *Smolow* and *Simon* complaints are the class representatives: Ronald J. Smolow is the class representative in *Smolow*, while Richard D. Simon and Vera Pomerantz are the class representatives in *Simon*. Notably, the class definitions are identical in both complaints:

> All persons and entities whose property was delivered to defendant as unclaimed or abandoned property pursuant to the DAUPA, converted to cash, and returned to the owner without just compensation during the Class Period. The Class Period begins six years prior to the filing of this lawsuit and is continuing.

*Compare Smolow* Am. Complaint ¶ 24 *with Simon* Complaint ¶ 22. Accordingly, Mr. Simon and Ms. Pomerantz are also members of the putative class in *Simon*.

As averred in the *Simon* Complaint, the original values of Mr. Simon's and Ms. Pomerantz's property were both substantially less than the original value of Mr. Smolow's property.[15] *Simon* Complaint ¶¶ 11–12. Nevertheless, these properties accumulated interest for the period of 1971 to 2007, whereas Mr. Smolow's property accumulated interest for the short period between August 2002 and January 5, 2004. The Court cannot determine on the present state of the record whether Mr. Simon and Ms. Pomerantz suffered a net loss. Thus, they may or may not be appropriate class representatives in the *Smolow* class action. However, filing a second, identical class action was not the appropriate course of action for plaintiff's counsel to have taken. Instead, plaintiff's counsel should have waited until the resolution of the cross-motions for summary judgment in *Smolow*, at which time Mr. Simon and Ms. Pomerantz could have either joined or replaced Mr. Smolow as class representatives.[16]

Having granted defendant's motion for summary judgment as against plaintiff *Smolow*, the Court grants leave to plaintiff's counsel to substitute Mr. Simon and Ms. Pomerantz or other putative class members as new class representatives in the *Smolow* case. If plaintiff's counsel does so, the Court will then dismiss the duplicative *Simon* class action without prejudice to the right of Mr. Simon and Ms. Pomerantz, or other putative class members, to proceed as class representatives in *Smolow*. Should the Court determine that any of the substituted class representatives did not suffer a net loss, the Court will then consider whether dismissing the *Smolow* case is appropriate.[17]

---

15. According to the *Simon* Complaint, the Treasury returned $95.33 to plaintiff Simon and $309.55 to plaintiff Pomerantz. *Simon* Complaint ¶ 11–12.

16. Another approach would have been to consolidate *Smolow* and *Simon*. The late juncture at which plaintiff's counsel filed the *Si-* mon action made this option unsuitable to the parties and to the Court.

17. *Gruber v. Price Waterhouse*, 1992 WL 240572, *7 (E.D.Pa.1992) is instructive on this point:

> [T]he class attorneys have now had two chances to present appropriate named plaintiffs to represent the class. In a case

## VI. CONCLUSION

For the foregoing reason, plaintiff's motion *in limine* is denied, plaintiff's motion for summary judgment is denied, and defendant's motion for summary judgment is granted as to plaintiff Smolow.

An appropriate order follows.

**AND NOW,** this 25th day of June, 2007, upon consideration of Plaintiff's Motion *In Limine* To Exclude Portions of the Expert Report and Testimony of John S. Stoner (Document No. 47, filed November 13, 2006); Defendant's Opposition to Plaintiff's Motion *In Limine* To Exclude Portions of the Expert Report and Testimony of John S. Stoner (Document No. 51, filed December 4, 2006); Plaintiff's Reply Memorandum of Law in Support of Motion *In Limine* to Exclude Portions of the Expert Report and Testimony of John S. Stoner (Document No. 57, filed Jan. 9, 2007); Plaintiff's Motion for Summary Judgment (Document No. 48, filed November 13, 2006); Defendant's Motion for Summary Judgment (Doc. No. 53, filed Dec. 11, 2006); Brief of Robert P. Casey, Jr. in Support of Defendant's Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment (Document No. 54, filed December 11, 2006); and Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment and Reply in Support of Plaintiff's Motion for Summary Judgment (Document No. 59, filed January 22, 2007), for the reasons set forth in the attached Memorandum, **IT IS ORDERED** as follows:

1. Plaintiff's Motion *In Limine* To Exclude Portions of the Expert Report and Testimony of John S. Stoner (Document No. 47, filed November 13, 2006) is **DENIED;**

2. Plaintiff's Motion for Summary Judgment (Document No. 48, filed November 13, 2006) is **DENIED;**

3. Defendant's Motion for Summary Judgment (Doc. No. 53, filed Dec. 11, 2006) is **GRANTED** as to plaintiff Ronald J. Smolow and **DENIED** to the extent that it asks the Court to enter judgment against the entire class and in favor of defendant; and

**IT IS FURTHER ORDERED** that plaintiff's counsel is granted leave to file within twenty (20) days a second amended complaint in which new class representative(s) are named. Failure to do so will result in entry of judgment in favor of defendant and against plaintiff Smolow in this case without further notice to plaintiff.

**IT IS FURTHER ORDERED** that the Court will conduct a status conference in due course.

that is almost six years old, dealing with events that occurred nearly ten years ago, I am satisfied I have provided ample opportunity to present a case on behalf of the class. I conclude that providing more time to produce more class representatives would needlessly prolong resolution. For these reasons, I also conclude this matter is no longer appropriate for certification as a class action.